Procter Coal Company v. Finley, &c.

CASE 68—PETITION EQUITY—DECEMBER 5.

98 405
e119 117

# Procter Coal Company v. Finley, &c.

APPEAL FROM JEFFERSON CIRCUIT COURT, CHANCERY DIVISION.

1. CORPORATIONS—STOCKHOLDERS' MEETINGS—METHOD OF VOTING.—
It is competent for a business corporation to provide through a by-law that "at stockholders' meetings each stockholder shall cast one vote for each share of stock owned by him," unless such a method of voting is in conflict with the charter or with some general law on the subject. And such a by-law applies to the election of a chairman as well as to the proceedings after the meeting has been regularly organized. And the fact that at previous meetings the chairman had without objection been selected by a count by the head can not affect the question as to the legal method of voting when the question is made for the first time.

2. SAME.—A stockholder having attempted to organize a stockholders' meeting by sun time instead of standard time and then made it a condition of postponement to the proper hour that he should still retain the floor, which was assented to by all parties, he was, when that hour arrived, lawfully in possession of the floor and had the right to make, receive and put nominations before the meeting. And upon his refusal to put to a vote by the head a motion for the election of a certain person as chairman, the person making the motion should, if he deemed himself unfairly treated, have appealed to the house from the obnoxious ruling, and had no right to put the motion himself.

3. AGREEMENT BY MAJORITY OF STOCKHOLDERS TO GIVE MINORITY CONTROL.—Even if the court could enforce an agreement by a majority of the stockholders to give the minority the right to control and manage the corporation, a question not determined, the evidence in this case as to such a contract is too vague and indefinite to establish its existence.

WM. LINDSAY FOR APPELLANTS.

1. Public policy does not interfere with the rights of a stockholder in a strictly private corporation to delegate to another the right to vote his stock, or to surrender the right to act as a director. While the right to vote the stock or to act as director is secured

by statute, it is a personal right in the exercise of which the public has no concern *per se*. (Murphy v. City of Louisville, 9 Bush, 195; Burke v. Stevenson, 8 Bush, 42; Moss v. Scott, 84 Ala., 611; Faulds v. Yates, 57 Ill., 416; White v. Thomas, &c., 28 Atl. Rep.)

2. The evidence establishes the existence of the agreement that the Louisville stockholders should control.

3. The appellees were seceders at the last stockholders' meeting.

The acts of a majority are not binding upon the company unless the proceedings are conducted regularly and in accordance with the general usage, or in the manner provided by the charter or by-laws of the company. (*In re* Argus Printing Co., 48 N. W. Rep., 347.)

DODD & DODD ALSO FOR APPELLANTS.

1. In view of the fact that the appellees and appellants have retained their original interest in the corporation of the Procter Coal Company, and no other rights have as yet intervened, the contract in question ought in equity and good conscience to be upheld as between the parties hereto. (White v. Thomas Inflatable Tire Co., 28 Atl. Rep. 78.)

2. The only legal meeting held on the 17th day of April, 1894, was the meeting presided over by W. E. Grinstead, and the only directors elected were the individual appellants and the appellee H. F. Finley. (Commonwealth *ex rel* Langdon v. Patterson, 158 Pa. St., 476-493; Cook on Stock and Stockholders, secs. 604, 605, 606; Warden v. Pope, 74 Mass., 140; *In re* Pioneer Paper Co., 36 How.; *In re* Argus Printing Co., 48 N. W. Rep., 347; 44 N. J. Law, 530; 17 Am. and Eng. Enc. of Law, pp. 45-50; People v. Albany, &c., R. Co., 55 Barb. 362.)

3. Section 551 of the Kentucky Statutes imperatively requires that each director shall, at the time of his election, own in his own right not less than three shares of capital stock. And the authorities overwhelmingly show that the stock book is the sole guide in stockholders' elections. (Thurber v. Crump, 86 Ky., 418.)

4. If this court should reach the conclusion that the contract set forth in the amended petition is not enforceable, and that the appellees owned and represented a majority of the stock present on April 17, 1794, it would still follow that at any legal election held that day, under the cumulative system of voting, authorized by section 207 of our present constitution, and by section 552 of the Kentucky Statutes, the appellants could at least, and would have easily elected three members of the board if the appellees had not seceded from the meeting.

BLAIN & KINKEAD AND O'NEAL, PHELPS, PRYOR & SELLIG-
MAN OF COUNSEL FOR APPELLANTS.

HUMPHREY & DAVIE, WM. H. HOLT AND W. O. HARRIS FOR
APPELLEES.

1. The by-law both as to voting by shares and as to voting by proxy
was entirely legal. (Cook on Stock and Stockholders, secs. 609
and 610; McCrary on Elections, sec. 607; 1 Morawetz on Private
Corporations, sec. 476 (a); People v. Crossley, 69 Ill., 195; Detweiler
v. Commonwealth, 18 Atl. Rep. 990; Ky. Stats., secs. 551, 552, 553,
559, 561.)

2. The right to vote by shares applied as well in the election of
chairman as upon any other question. (Cook on Stock and
Stockholders, sec. 609.)

3. On the assembling of a stockholders' meeting any one has the
right to call the meeting to order and to preside until another
person shall be elected to preside. (Case of Pioneer Paper Co.,
36 How. Pr., 136.)

4. If Judge Finley decided wrong as to the proper mode of voting
for chairman there was but one orderly way to correct his de-
cision and that was by an appeal to the House.

5. An agreement to give the control of a corporation to a minority
of the stockholders can not be enforced. (Cook on Stock and
Stockholders, sec. 610; Dulin v. Pacific Wood & Coal Co., 103 Cal.,
357; s. c. 35 Pac. Rep., 1045, and 37 Pac. Rep., 207; Bostwick v.
Chapman, 60 Conn., 576; s. c. 24 Atl. Rep., 39; Griffith v. Jewett, 15.
Weekly Law Bulletin, 419; Cone v. Russell, 48 N. J. Eq., 208; s. c.
21 Atl. Rep., 847.)

6. The plaintiffs having passed a resolution accepting the constitu-
tion and cumulative voting under section 207 can not now allege
an agreement for a different method of voting.

JUDGE EASTIN DELIVERED THE OPINION OF THE COURT.

This action was brought by appellants, Procter Coal Com-
pany, W. E. Grinstead, claiming to be its president, H. C.
Grinstead, claiming to be its secretary and treasurer, and
various individuals claiming to be members of its board of
directors, against the appellees, seeking to enjoin the latter
from interfering in any manner with the possession and con-
trol of the books, papers or property of the Procter Coal

Company, and from molesting in any manner the individual appellants in the exercise of their alleged rights and duties as the president, secretary and treasurer, and board of directors of said Coal Company. The requisite bond having been given, a temporary injunction was granted by the court below in accordance with the prayer of the petition.

An answer was filed by appellees denying that W. E. Grinstead is the president, or that H. C. Grinstead is the secretary and treasurer, or that the individual appellants, or any or either of them, are directors of the Procter Coal Company, and alleging that the appellees constitute the duly elected and qualified board of directors of said company.

To this answer, which was made a counterclaim against appellants, a reply was filed and on the same day an amended petition was tendered, alleging in substance that, as an inducement to appellants to subscribe for the stock of said company, it was proposed and represented to them by appellees and their associates that they, appellants and their associates, should have the control and management of the said corporation until the money contributed by them should be refunded in the shape of dividends or otherwise, or until they disposed of their stock to other parties.

The amended petition so tendered was afterwards ordered to be filed, and having been controverted of record, and proof having been taken, the chancellor adjudged on the trial below that the petition be dismissed, that the temporary injunction be dissolved, and that appellees be awarded the relief asked for by their counterclaim; but, an appeal being desired and bond having been executed, the injunction was continued in force during the pendency of this appeal, which is prosecuted from said judgment.

The contention, therefore, as will be seen, is between these two different sets of persons—the individual appellants on

the one side and the appellees on the other—each claiming to be the legally elected and duly authorized board of directors of the Procter Coal Company, and each claiming to have been so elected at the regular annual meeting of the stock-holders of said company, held on the 17th day of April, 1894. In passing upon these claims, therefore, it is necessary to consider carefully and with some detail the proceedings of this stockholders' meeting, and, in order to do this more in-telligently, it is well to understand something of the atti-tude toward each other of the respective parties to this liti-gation prior to the date of the meeting in question.

It appears, then, from facts disclosed in this record, that the mining property of the Procter Coal Company is located in Whitley county, Kentucky, where all or nearly all of the appellees reside; that it originally belonged to two or more of the appellees who, together with perhaps two others of their number, organized the corporation by which the prop-erty has been developed and is now owned, while the indi-vidual appellants, all of whom reside in the city of Louisville or its vicinity, by the purchase of stock in the corporation, actually furnished the greater part of the money capital which has been used in the development of the property. Without going into the details or striking any balance of the accounts between these parties it is sufficient to say that the greater part of the stock held by appellants, who, for the sake of convenience, will be denominated the Louisville peo-ple, was paid for in cash at fifty cents on the dollar, while that held by appellees, whom we shall call the Whitley county people, represents, to a large extent, the mining property and property rights that went into and now be-longs to the corporation, and the services rendered in organ-izing and launching the same.

Notwithstanding the fact that the Whitley county people

seem to have owned a majority of the stock, yet, from the organization of the company in 1887, a majority of the board of directors and the chief executive officers of the corporation have been chosen, from year to year, from the Louisville stockholders, without protest or objection on part of the Whitley county stockholders, up to the annual meeting of stockholders which occurred April 17, 1893. At that time it appears from the record that an attempt was made by the Whitley county people to elect a majority of the board from their own body, but that, notwithstanding the fact that they controlled a majority of the stock, they failed in their purpose, by reason of some of the proxies under which they attempted to vote some of this stock having been declared to be invalid.

A full board of directors from the Louisville stockholders was elected at that meeting, and from that time forward at least there seem to have been two well defined and somewhat antagonistic sets of stockholders.

Before the arrival of the day for holding the next annual meeting, on April 17, 1894, it seems to have been well understood that the effort on part of the Whitley county stockholders to elect at least a majority of the board of directors from their own number would be renewed, and, therefore, both sides were, to some extent, prepared for the contest which arose in that meeting and out of which this litigation has come, though perhaps neither anticipated it in the exact form in which it has arisen.

The record discloses that on the day before this annual meeting was held, to-wit, on April 16, 1894, the appellees, H. F. Finley and A. Gatliff, who are the largest stockholders and the leading spirits among the Whitley county people, called upon the appellant, W. E. Grinstead, who was then and now claims to be president of the company, and who has

been recognized as the leader among the Louisville stock-holders, and proposed to said Grinstead, in the interest of harmony, that the Whitley county stockholders be allowed to select four, and the Louisville stockholders select the other three, of the seven directors of the company at the meeting on the following day. This proposition was not ac-ceded to by Mr. Grinstead for the reason, as substantially given in his testimony, that he saw nothing to be gained by such an arrangement, inasmuch as the Louisville people controlled enough of the stock to enable them, by the sys tem of cumulative voting authorized by the constitution, the provisions of which had been accepted by the company, to elect three of the seven directors in any event, and for the further reason that, while he knew the majority of the stock was controlled by the Whitley county people, yet, as the Louisville people had a majority in number of stockholders, it was thought that they could in that way gain control of the meeting and thereby get the appointment of the com-mittee to pass on proxies. The importance of this matter seems to have been fully appreciated by both sides, and, therefore, the contest which arose over the organization of the stockholders' meeting is not to be wondered at.

The hour for the meeting, as fixed in the notice, was 4 o'clock p. m. In the city of Louisville, where the meeting was held, most of the business is conducted by what is known as standard time, which is about eighteen minutes slower than what is known as sun time, and the hour of the day, as generally understood and used there, is accepted as referring to standard time.

But promptly at four o'clock, by sun time, on the day of this election, most of the Whitley county stockholders and some of the Louisville stockholders having gathered in the designated place of meeting, the appellee Finley arose and

having called for order, placed in nomination the name of Dr. Gatliff for chairman of the meeting. A protest was at once made by the Louisville stockholders, who claimed that, as the meeting was to be held by standard time, the hour had not arrived and the Louisville stockholders were not yet present. The name of Mr. Grinstead seems also to have been placed before the meeting for chairman, but subsequently withdrawn, and, in the confusion which followed, a conference between the attorneys representing the respective factions was suggested and agreed on. The result of this conference was an agreement that no further steps should be taken towards organizing the meeting until 4 o'clock by standard time, but that appellee Finley should still hold the floor until the arrival of that hour, when he should have the right to renew his motion for the election of Dr. Gatliff as chairman, and when Mr. Kinkead, who seems to have nominated Mr. Grinstead, should have the right to again put him in nomination for chairman.

This arrangement was carried out, and the meeting having been again called to order by Judge Finley, who still held the floor, the names of the two gentlemen above referred to were placed in nomination. At this point great confusion seems to have arisen, and there is much conflict in the great volume of testimony in the record as to what immediately followed and as to the manner in which the division or separation of the stockholders into two factions or parties, which soon ensued, was actually brought about. The testimony of appellees conduces to show that Judge Finley, who had himself nominated Dr. Gatliff and to whom the nomination of Mr. Grinstead was addressed, proposed to take the vote on these nominations by stock; that he demanded of H. C. Grinstead, the secretary of the company, that he call off the names of the stockholders from the stock book, which

Procter Coal Company v. Finley, &c.

demand was refused, and, though some of the appellants' witnesses testify that Judge Finley was subsequently informed that he could have the book or a list of the stockholders taken from it, yet neither was in fact furnished to him and he proceeded to take this stock vote by personal application to the stockholders to cast their votes.

In the meantime it appears that Mr. Kinkead, who had nominated Mr. Grinstead, was demanding of Judge Finley that he put his (Kinkead's) motion to the meeting, that this demand was made at least three times, but was wholly disregarded by Judge Finley, whereupon Mr. Kinkead announced to him that, if he persisted in his refusal, he would himself put his own motion, and did thereupon call upon all who were in favor of the election of Mr. Grinstead as chair man to stand up, and, upon a count of heads, Mr. Grinstead was declared elected, assumed the chair and proceeded to act as chairman of the faction adhering to him and his associates, while Judge Finley was still engaged in taking the vote by stock of those who adhered to or recognized him. The vote so taken by Finley resulted in the election of Dr. Gatliff as chairman, and, this being declared, he proceeded to act as such, so that we here have two separate bodies of stockholders presided over by separate chairmen and each claiming to be the regular meeting of stockholders of this company.

Each of these bodies proceeded to elect a separate board of directors for the company, the one presided over by Grinstead electing the six individual appellants and the appellee Finley, and the one presided over by Gatliff electing the appellees.

The first question to be considered, therefore, is which of these was the legal meeting, for both could not have been so,

and which set of individuals, claiming to have been elected, was legally elected?

It seems to us clear, from the great mass of testimony which we have been called upon to consider in this case, that the main point of difference between Mr. Kinkead and Judge Finley, which led directly to the division of the meeting into two separate bodies, was as to the proper manner of taking the vote for chairman.

The stockholders represented by the former were in the majority numerically, while those represented by the latter controlled a majority of the shares, and each was anxious to control the organization of the meeting for the sake of any legitimate advantage that might be derived therefrom. The motion of Mr. Kinkead, which Judge Finley is charged with having refused to put to the meeting, seems to have been his motion that Mr. Grinstead be elected chairman, as, after having threatened to put his own motion in case of the further refusal of Judge Finley to do so, Mr. Kinkead did, in pursuance of that threat, put this motion that Grinstead be elected, and no other motion, and that motion he put to a vote by the head. Finley not only declined to put Kinkead's motion to the meeting on that kind of a vote, but neither did he put his own motion for the election of Gatliff to a head vote, but persisted in conducting the election by a stock vote. It seems to us, therefore, that this was the matter in issue between these two gentlemen, and, as the division which took place is largely attributable to their controversy on this point, the settlement of the question as to which of them was correct in his contention will tend largely to solve the question as to which of these was the legal meeting.

By section 2 of its charter the Procter Coal Co. was authorized, through its board of directors, to pass such by-laws as might, from time to time, be deemed necessary, and, pur-

suant to that authority, it did pass a by-law in these words, to-wit:

"Section 6. At stockholders' meetings each stockholder shall cast one vote for each share of stock owned by him. Votes may be cast by proxy in writing and attested by one witness."

That this by-law is entirely legal and valid we have no doubt. It is true that at common law each shareholder was entitled to but one vote, irrespective of the number of shares he might hold, but it is now established by the best authori- ties that this rule does not apply at the present day to ordin- ary business corporations, and especially is it established that it is competent for the corporation to provide otherwise through a by-law unless the same is in conflict with some general law on the subject.

That there is nothing in our legislation which would pro- hibit the passage of such a by-law is certain; but, on the con- trary, the right of voting by the share is expressly recog- nized by the constitution of this State, the provisions of which had been accepted by this corporation prior to the date of this election. By section 207 of our State constitu- tion the cumulative system of voting in the election of di- rectors of corporations is authorized and provided for, and that system is founded upon the right to cast one vote for each share of stock. Nor can anything be found in any of our legislation that would render such a provision invalid.

That there has been a general departure from the common law rule on this subject is recognized by the ablest text writers. After referring to that rule, it is said by one of these: "But, by long continued custom and usage, it has been established as a principle of corporation law that each shareholder is entitled to one vote for each of his shares of stock and this is presumed to be the law governing every

corporation unless a contrary intention is expressed by the charter or some general provision of law." McCrary on Elections, section 607.

Again, it is said by another: "The custom of giving the shareholders in such companies" (business corporations) "a vote for every share has become so well established that it is fair to imply an intention to follow this custom in the absence of any indication to the contrary." (Morawetz on Private Corporations, section 476a.)

And Mr. Cook, after referring to the rule which gave to each person in public and municipal corporations one vote only, says: "But the same rule should not apply to private corporations. Stockholders are interested not equally but in proportion to the number of shares held by them. 'Naturally and reasonably each share should be entitled to one vote." (Cook on Stockholders, section 609.)

This may be taken as the established doctrine on the subject, and we have no doubt as to the validity of the by-law in question. But it is insisted for appellants that this by-law had never before been invoked in the organization of the stockholders' meetings of this company, and, furthermore, that it has no application to the election of a chairman, but only refers to the proceedings after the meeting has been regularly organized. We are unable to see, however, that the fact that at all previous meetings of the stockholders of this company a chairman was selected by consent or was chosen by a *viva voce* vote, as it is called in the record, or by a count by the head, can affect the question as to the legal method of election when the question is made. This was the first meeting of the stockholders of this company, so far as the record shows, in which there was ever a contest over the

election of a chairman, and the necessity for or propriety of insisting on this by-law had never before arisen.

Nor can we concur with counsel for appellants in their contention that this by-law only applies in the election of directors and to proceedings after the meeting has been regularly organized. There is nothing in the by-law itself which would so limit its application. The language is: "At stockholders' meetings." This was certainly a stockholders' meeting as soon as it was called to order and proceeded to the election of a chairman. It was not an organized meeting, but it was a meeting of the stockholders engaged in the preliminary work of its own organization, and if not a stockholders' meeting it would have had no power to elect, a chairman. And,furthermore, if this by-law be restricted in its application to the election of directors, it is wholly useless and has no efficacy whatever for the reason that the constitution of the State, having provided for cumulative voting, has given the right to one vote for each share of stock in such elections. Referring to provisions of this character, Mr. Cook, in section 609, above quoted from, says: "And a statutory or charter provision to this effect applies not only to elections, but also to all other questions that may come before the stockholders' meetings."

In this we agree with him, and think that this by-law applies to the election of a chairman of a stockholders' meeting, notwithstanding the further objection urged by counsel that it is impossible to tell, before the meeting has been organized, how many shares each stockholder may own. To this last objection it would seem to be a sufficient answer to say that it would apply with equal force to a vote taken by the head. There it must be ascertained that the party offering to vote is a *bona fide* stockholder, and the very same

investigation that would determine this question would also disclose how many shares of stock he owned. The registry of shareholders must be consulted in order to ascertain the one fact as well as the other. If this can not be done before the meeting is organized, in order to ascertain the number of shares owned by one proposing to vote as a stockholder, neither can it be done to ascertain whether or not he is a stockholder at all, and, therefore, according to the contention of counsel, the meeting might never be legally organized. It seems to us, therefore, that this objection to a vote by stock in the election of a chairman is wholly untenable.

Having now reached the conclusion that appellee Finley was correct in his contention as to the manner of taking the vote on the election of a chairman, we will notice briefly some of the other alleged irregularities in the meeting conducted by him.

As to the complaint that he attempted to organize the meeting by sun time instead of standard time it is only necessary to say that this becomes wholly unimportant in view of the arrangement made between the parties, and the fact that it was actually organized at the proper time and place. If Finley made it a condition of the postponement to the proper hour that he should still retain the floor, yet this was assented to by all parties, and when that hour arrived he was lawfully in possession of the floor, and had the right to make, receive and put nominations before the meeting. In the preliminary organization of every public meeting this position must be assumed by or assigned to some one individual, and to bring order out of chaos, a certain degree of authority must be conceded to him. This fact was recognized by Mr. Kinkead in presenting the name of Mr. Grinstead for chairman and demanding of Judge Finley, as he seems to

have done more than once, that Finley put the motion to the meeting. Although the latter refused to put the motion to a vote by the head, as Kinkead insisted it should be done, and proceeded, in disregard of Kinkead's demand, to take the vote by stock, had Kinkead the right himself to put his motion to a head vote and to declare Grinstead the chairman of the meeting, upon a vote of a majority in number of the stockholders constituting his faction? We think not. It seems to us that, in view of the fact that it was agreed that Finley should have the floor for the purpose of bringing about an organization of the meeting, and that Kinkead had recognized his authority in putting all motions to the meeting, it was the duty of Mr. Kinkead, when he thought he was being unfairly treated, to have appealed to the house from the obnoxious ruling of Judge Finley. The course adopted by him in putting to a vote by the head a motion which Finley had refused so to put, and as to which question of method, as it seems to us, Finley was correct and Kinkead was wrong, was calculated to bring about the very result which followed. We can not think that Mr. Kinkead had the right thus to take the floor from Judge Finley and to proceed to organize the stockholders' meeting in the way in which he did, nor can we think that the meeting which he thus attempted to organize was legally organized.

If this be correct, then the charge that the meeting conducted by Judge Finley seceded from the meeting presided over by Mr. Grinstead is not sustained, and does not need to be further considered.

The only other question that we shall notice is raised by the amended petition which asserts a right on part of the individual appellants to the control and management of this corporation, in virtue of an alleged agreement on the part of

appellees that they should have this control, in consideration of subscribing for and taking stock in the corporation. This contract, as alleged in the amended petition, was that if appellants and their associates would raise and aid in raising the money, which they claim to have raised, then, in consideration thereof, they "should have the control and management of the said corporation until the money contributed by them should be refunded to them in the shape of dividends, or otherwise, or until they disposed of their stock to other parties."

Appellants allege that they have not disposed of their stock, and that their money has not been refunded to them, and upon this they claim a contract right which would entitle them to the control of the board of directors or managing board of the corporation.

The chancellor expressed the opinion in the trial below that this agreement was sustained by the weight of evidence, but held that, in view of the fact that appellees own a majority of the stock of the corporation, that they have never given proxies to appellants to vote the same and have never been asked so to vote it themselves, and that to enforce it would be to disfranchise the majority, the agreement could not be enforced. Much of the argument of counsel for the respective parties here is devoted to the discussion of the enforceability of this alleged contract, and, while we recognize their ability, as well as the force of the observations of the learned chancellor on this point, yet, in our view of the case, it is unnecessary for us to pass upon this question. We differ from the chancellor as to the weight of the evidence in the case, and are of the opinion that it is altogether too vague and indefinite to establish the contract claimed for appellants.

It is not necessary to comment on the fact that a contract of the character alleged, and which would probably run through a long period of time, was not reduced to writing, nor upon the fact that it was never asserted and that no rights were ever claimed under it at any time, although appellees had tried to get the control of the corporation at the election of 1893, and, as appellants knew, were going to try again to do so in 1894, nor upon the fact that it was not relied on when the petition in this case was filed, but was set up for the first time in the amended petition; nor upon the fact testified to by Terstegge that Grinstead, when telling him the day before the election that the Whitley county people were going to get control of the board of directors, being asked what they could do about it, replied that there was nothing to do except to submit.

Aside from these facts, the testimony is, in our opinion, entirely too vague, uncertain and conflicting to show that there ever was any clearly-defined or well-understood contract of the kind asserted, which, if otherwise valid, the courts could enforce.

It is to be observed that the agreement alleged in the amended petition is that appellants and their associates should have the control of the corporation "until the money contributed by them should be refunded to them in the shape of dividends, or otherwise, or until they disposed of their stock to other parties."

Now, a brief analysis of the testimony of the eight witnesses who testify for appellants on this subject, six of whom are themselves appellants, will show how indefinite, how uncertain and how conflicting they are in their statements as to the terms of this agreement.

W. E. Grinstead is the only witness, we believe, who testi-

fies that they were to have control until their money was received back in dividends, and this he states was a general understanding.   He seems, however, to lay more stress upon the promises of Hutchcraft to this effect, in which he says Dr. Gatliff concurred; but, being asked directly whether Hutchcraft ever made him such a promise, he answers: "Well, I can't answer that question;" and being asked in the next question, "You are not able, then, to state that Mr. Hutchcraft did make such a promise, are you?" his answer was, "There was a general promise to that effect."

This is the only witness, as we have said, who testifies that the Louisville people were to have control until they received their money back in dividends.   The others give a variety of other versions as to the terms of the agreement.

S. S. Eastwood says that the promoters said to him "that their wish and desire was that the parties putting up the money should control what I term the executive part of the company."   He further says that this was to last as long as the affairs of the company were well conducted, but that nothing was said as to who should be the judge of this, and that he heard nothing said as to retaining control until their money was repaid in dividends.

Chas. R. Kelly understood that the Louisville people should control the property, but fixes no limit of time or terms during which they should control it.

Chas. Warren fixes no time during which they should control it, and says he was so told by W. N. Culp, who is now one of the appellants, but who solicited stock subscriptions for the company.

H. Terstegge says the agreement was that the control of the corporation should always remain with the Louisville people, and W. M. Vaughn, who subscribed for none of the

stock, but who heard the matter discussed frequently, says the Louisville people were to have control as long as they owned their stock.   C. B. Compton says the agreement was that they should have the executive officers, but that it did not include the board of directors, and W. N. Culp, the last of appellant's eight witnesses on this subject, says the agreement was that the Louisville people were to have the president and treasurer of the company, nothing being said about the secretary, and being asked how about the board of directors, says "they were to be represented in the directory," and, explaining this further, says they were to "have a full representation.   I don't know that I remember what directors was said."   He further states that this was to continue as long as the Louisville people held their stock.

In deference to the opinion of the chancellor, from whom we differ as to the weight of the evidence in the case, we have thus hurriedly noticed the testimony of each of appellant's witnesses as to the terms and conditions of the contract referred to, and we think that, without referring to the testimony of appellees' witnesses, who are said to have made these promises, and who, more or less positively, deny having made them, it is made clear that this testimony fails satisfactorily to establish the contract relied on.

It may be, and is no doubt, true, that some of the promoters of this company may have expressed a willingness for the Louisville people to take control of this corporation, or to have the executive officers, but that the evidence fails to establish any positive or definite contract or agreement giving them the control for all time, or any given time, and of a sufficiently certain character to justify the court in taking from the majority of the stockholders the control of property in which they are more largely interested than

those who are demanding its surrender, is very clear to our minds.

For the reasons indicated the judgment of the court below is affirmed.