## Western Cottage Piano & Organ Company, Appellee, v. Thomas W. Burrows et al., Appellants.

### Gen. Nos. 4,988, 4,989.

1. CORPORATIONS—*when directors' meeting lawful.* If all the directors are present and participate the meeting is, lawful and general business of the corporation may be transacted.

2. CORPORATIONS—*effect of failure to elect successors to directors.* If successors to directors whose terms have expired are not chosen, the old directors continue in office.

3. CORPORATIONS—*what majority of directors controls.* At properly called meetings of directors a majority of the number present controls, if a majority of the board is present, and a majority carries any propositions submitted to vote, unless some statute or by-law requires more than a majority.

4. CORPORATIONS—*when directors authorized to fix salaries.* Where the by-laws of a corporation require that the salaries of officers shall be fixed annually by the resolution of the board of directors, a hold-over board is authorized by resolution to carry out such by-law.

5. CORPORATIONS—*when board of directors may elect officers.* A hold-over board of directors has power to elect officers for the ensuing corporate year.

6. CORPORATIONS—*when stockholders' meeting adjourned.* When

all stockholders have left the room and the story of the building in which the stockholders' meeting had been held, such meeting is deemed to have been adjourned and abandoned, even though the motion to adjourn was irregularly put to vote and was not lawfully adopted.

7. CORPORATIONS—*how stock should be voted to organize stockholders' meetings.* Voting to organize stockholders' meetings should be by shares of stock.

8. CORPORATIONS—*when stockholders' meeting illegal.* Where there is an absence of good faith and an adjourned meeting of stockholders is held in such a way as to prevent certain of the stockholders from knowing of it, the proceedings are invalid.

9. CORPORATIONS—*when equity will determine title to office.* If the title to an office in a private corporation is the only matter involved equity will not take jurisdiction, but where the title to such an office is necessarily involved in a cause properly before a court of equity, jurisdiction will be assumed and the matter of title settled.

10. INJUNCTIONS—*when lie to maintain status of corporate officers.* An injunction will lie to restrain interference by pretended officers of a corporation with the legal officers thereof where it appears that such pretended officers are pursuing a course of conduct calculated to destroy the financial standing of the corporation and are insolvent and incapable of compensating the corporation in damages.

11. INJUNCTIONS—*upon what issued.* As a general rule an injunction will only lie upon a bill or cross-bill, but where a court of equity is already in possession of a cause and has jurisdiction of both the subject-matter and of the parties, it may enforce obedience to its mandates by an injunction issued merely upon a petition in the cause, without the filing of a bill.

Bill for injunction. Appeal from the Circuit Court of LaSalle county; the Hon. EDGAR ELDREDGE, Judge, presiding. Heard in this court at the April term, 1908. Affirmed. Opinon filed August 10, 1908. Rehearing denied October 14, 1908, and additional opinion filed.

EDDY, HALEY & WETTEN, and BUTTERS, ARMSTRONG & FERGUSON, for appellants; P. C. HALEY, of counsel.

DUNCAN, DOYLE & O'CONOR, for appellee.

MR. JUSTICE DIBELL delivered the opinion of the court.

On January 9, 1908, the Western Cottage Piano & Or-

gan Company, hereinafter called the company, filed its
bill in equity against Thomas W. Burrows and Jarvis
R. Burrows, asking an injunction to restrain the de-
fendants from interfering with Louis W. Merrifield, its
president and general manager, in the execution of his
duties as such officer, and to restrain the defendants
from performing or attempting to perform any of the
duties of said president and general manager. An
injunction was granted without notice and was served.
On January 16, 1908, the defendants moved the court
to dissolve the injunction for want of equity on the
face of the bill, and on the same day they filed an an-
swer. On February 17 and 18, 1908, the motion to dis-
solve the injunction was heard upon affidavits and
documentary and oral evidence, and was denied, and
defendants prayed and were allowed an appeal to this
court. On February 19, 1908, the defendants entered
another motion to dissolve the injunction on bill, an-
swer, affidavits and exhibits and testimony already
heard, and that motion was denied, and defendants
again prayed and were again allowed an appeal to this
court. They filed two appeal bonds. The first appeal
bond to be approved purported to be an appeal from
both of said orders refusing to dissolve the injunction,
and in the case made by that appeal a record has been
filed, which does not contain their answer nor the
proofs heard on that motion. The appeal bond last filed
purports to be an appeal from the order denying the
motion to dissolve, based upon the answer, affidavits
and exhibits, and in the case made by that appeal a full
record is filed. The cases have been consolidated in
this court. Although the original motion was to dis-
solve the injunction for want of equity on the face of
the bill, yet the subsequent action of defendants in
filing an answer and in offering proofs in support of
the motion, without any objection to that course of
procedure, shows that the motion actually heard was
not based merely upon the alleged want of equity on
the face of the bill, but was upon the pleadings and

proofs. The only question for our consideration is whether the court erred in refusing to dissolve the injunction on pleadings and proofs.

The immediate controversy centers around the events of January 7 and 9, 1908. It will, however, aid in understanding the situation which led to the filing of the bill and in determining whether the conduct of defendants on those days tended to the destruction of the business and financial interests of the complainant, if we examine the prior history of the company and the prior conduct of the defendants towards it, leading up to the events which caused this application for an injunction, as such history is given by the proofs in this record. Leonard B. Merrifield was the husband of Mrs. Mary C. Merrifield, and the father of Louis W. Merrifield and Mrs. Lilla M. Wood. Leonard B. Merrifield established the business now conducted by complainant over thirty years ago at Mendota and transferred it to Ottawa over twenty years ago, and for several years before the defendants became interested in the company he owned the majority of the stock and personally managed the business. The charter of a former corporation, having the same name, expired in 1900, and the present corporation was then organized by Leonard B. Merrifield and members of his family and continued the business. The corporate stock was $100,000, divided into 1,000 shares of the par value of $100 each. In the latter part of 1902, defendants bought some stock in the company and Leonard B. Merrifield assisted them in buying enough more to give them one-half the total capital stock of the company. In acquiring this stock Thomas W. Burrows, about December 24, 1902, bought 140 shares from one A. H. Merrifield for $33,600, giving in part payment therefor his note for $30,000, with interest at 5% per annum, upon which note Leonard B. Merrifield became a guarantor, although he received no part of the consideration. The note was due in five years, but there was indorsed upon it an agreement that any

amount might be paid thereon at any time. Thomas .W. Burrows has never paid any part of this note. Leonard B. Merrifield died April 15, 1903. Thomas W. Burrows became administrator of his estate. A. H. Merrifield filed a claim against said estate on said note, and Thomas W. Burrows, the administrator and principal debtor, permitted it to be allowed against said estate on May 20, 1904, in the sum of $30,606.25. At this time Thomas W. Burrows claimed that he had transferred these 140 shares to Jarvis R. Burrows, his brother, and that the latter had agreed to assist him in paying for them, and Thomas said that he could not pay the note at that time but could do so about the time of its maturity; and he proposed to the Merrifields that the funds of the complainant be used to pay this claim, and that he and Jarvis would give their note to the company for the moneys so used. This proposition was accepted by the Merrifield family and was agreed to by Jarvis R. Burrows. Thereupon Thomas W. Burrows and Louis W. Merrifield went to Chicago and negotiated a loan with W. T. Rickards & Company, loan brokers, on four notes of the company of $5,000 each at four months' time, which notes were apparently indorsed by Louis W. Merrifield and Thomas W. Burrows before delivery, and to secure which Rickards & Company further required that Mrs. Merrifield should deposit certain collateral security, which she did. After deducting the interest in advance, these notes netted $19,642.48. These proceeds were turned over to Thomas W. Burrows as administrator and were used in part payment of said claim of A. H. Merrifield. To pay the balance of said claim Thomas W. Burrows as vice-president of the company drew the check of the company for $10,912.52 on December 16, 1904, and applied that also in payment of the claim. Thereupon, on December 16, 1904, Thomas W. Burrows and Jarvis R. Burrows gave their note to the company for $30,045, due in three years, with interest at 5% per annum, payable annually, all of which is still unpaid, both princi-

pal and interest.  Complainant charges in its brief that the defendants removed said note from the office and vaults of the company and destroyed it.  We do not find any proof of this fact in the record, except a recital in a resolution adopted by the board of directors on January 7, 1908, but its removal at least seems to be conceded in defendants' supplemental brief, filed since the original argument, and they seek to justify it on grounds that we regard as wholly untenable.  The removal of that note, however, by the defendants, the makers, and its destruction, if they did destroy it, were strongly calculated to destroy the confidence which the Merrifield family seem to have originally placed in the Burrows brothers.  We understand the proofs to show that renewals of these four notes for $5,000 each are in litigation in another suit now pending in this court.

It is charged in complainant's brief here that after the injunction herein was granted Thomas W. Burrows removed from the company's vaults about $30,000 of the company's bills receivable, and that on a hearing he was found guilty of contempt and, upon returning the notes, was adjudged to pay a nominal fine.  This seems to be conceded in the arguments for defendants, but, while the judgment finding him guilty of contempt is in this record, we find nothing to show what the nature of the contempt was.

Before Leonard B. Merrifield died, his son, Louis W. Merrifield, who will be hereinafter called Merrifield for brevity, was elected president of the company and, by virtue of the by-laws, became also general manager.  As vice-president he had performed many of the duties of these offices during his father's illness of one year and a half preceding his death.  The salary of the president and general manager was $2,500 per annum.  At the same time Thomas W. Burrows was elected vice-president and treasurer, and Jarvis R. Burrows, who was a practicing attorney, was elected auditor and attorney for, the company, and a salary of $2,500 per annum was established for each.  Soon after Leonard

B. Merrifield died, the health of Merrifield the president, became impaired, and Thomas W. Burrows, who was a physician and his medical adviser, urged him to go away for his health and insisted upon his doing so, and he did go away on that account and was absent two or three months each year for two or three years. During those absences Thomas W. Burrows, the vice-president, took charge of the business and acted as president and general manager, and when Merrifield was at home and around the factory during those years Thomas W. Burrows continued to a large extent to perform the duties of those offices because of the impaired health of the president. Thomas W. Burrows had never had any experience in the conduct of such a business. There is much dispute as to the result of his conduct of the business. That question cannot be safely determined on mere affidavits without a cross examination to bring out further details, but when all these affidavits are studied, we think it is made to appear, so far as it can be by affidavits, that the administration of Thomas W. Burrows was very injurious to the financial interests of the complainant and that thereby its indebtedness was greatly increased and its assets greatly impaired and reduced. A few weeks before Leonard B. Merrifield died, on motion of Thomas W. Burrows, a dividend of 50% was declared and paid upon the capital stock, and Thomas W. Burrows and Jarvis R. Burrows received $25,000 on this stock, for much of which they had not paid. Nine months and twenty-two days later, on motion of Thomas W. Burrows, another dividend of 20% was ordered and paid, and Thomas W. Burrows and Jarvis R. Burrows received $10,000 more upon this stock. Within less than ten months, on action initiated by them, they took out $35,000 in dividends upon stock which was largely not paid for and for which they were heavily indebted either to the Merrifield family or to the company. Defendants contend that these dividends were taken out of the capital of the concern, whereas the proof for

complainant is that they were paid out of profits earned during the two preceding years. Whichever be true, these payments greatly reduced the funds on hand. True, the Merrifields consented to these dividends and received an equal amount. But they were in deep distress. When the first dividend was proposed, their husband and father, the founder of the business, was near the end of life, and when the second was made, the father was dead, the new head of the family and of the business was ill, and the business was in charge of his trusted physician, Thomas W. Burrows. Moreover, the Merrifield family were receiving dividends out of property which they owned, equitably as well as legally, and which was paid for, while Thomas W. Burrows and Jarvis R. Burrows received their dividends upon stock none of which was in their possession but all of which was in the possession of Mrs. Mary C. Merrifield as collateral security for an indebtedness of about $30,000 which they owed to her. They have since received another dividend of 10%, so that they have taken out of the concern $40,000 in dividends, besides their two salaries, aggregating $5,000 per year, for nearly or quite five years.

The proof shows that when first Thomas W. Burrows failed to pay the indebtedness incurred by him for stock as hereinbefore stated, his sole excuse was his inability to pay, coupled with assurances that he would be able to pay later. The later failure of the Burrows brothers to pay is excused by them on the following ground: They state that Leonard B. Merrifield agreed with them that he would organize a New Jersey corporation to hold the stock of complainant or the majority thereof, and that he would so arrange the charter of the holding company that the Burrows brothers should have equal control of complainant with the Merrifield holdings; that Leonard B. Merrifield found obstacles in the way of organizing such a New Jersey corporation because of the requirements of the statutes of that state, and that because of his serious ill-

ness and death he was prevented from devising some other scheme for accomplishing that result; and that because of his agreement to organize such a holding corporation in which they should have as much power as the Merrifield family, the Burrows brothers paid him for stock a larger price than he could otherwise have obtained. It is not stated that this contract was in writing nor is any such written contract produced. It seems to us to dispose of these excuses for not paying for this stock, as far as the present suit is concerned, to state that each of the notes now existing and outstanding referred to in this opinion were given long after Leonard B. Merrifield died. Moreover, the Burrows brothers have as much stock as the Merrifield family in this corporation and an equal right to its control, and that was all that they claimed Leonard B. Merrifield agreed to secure for them.

In March, 1907, Merrifield, the president, became satisfied that the assets of the company had greatly depreciated under the administration of Thomas W. Burrows, and he thereupon resumed full charge of the business. From that time on the Burrows brothers pursued a course of conduct tending to destroy discipline among the employes of the company, to provoke discord and to destroy the reputation and business of the company. In May, 1907, Thomas W. Burrows and Jarvis R. Burrows filed a bill in equity against the company and obtained the appointment of a receiver, who conducted its affairs till November 1, 1907, when the receiver was discharged, the property restored to the officers of the company, and they resumed charge of the business. The chancery case, or some branch of it, is still pending, and the proofs seem to indicate that the Burrows brothers have brought still another suit in equity, either against the company alone or against it and the Merrifields. Bitter complaint is now made of the reduction of the salaries of the treasurer and secretary to $200 each per year, made on January 7, 1908, but the salary of the president and general manager

was at the same time reduced to $400 per year, so that
the reduction was equally fair to all. It was obviously
done in an effort to save the company from the finan-
cial distress brought upon it largely by the conduct of
the Burrows brothers.

In April, 1907, the company was the owner of real
estate in South Dakota, obtained by it in liquidation of
a claim it had against an agent. Jarvis R. Burrows,
while acting as auditor and attorney for the company,
claimed to have seen the land. Merrifield, the presi-
dent, had not seen it and did not know how many acres
there were nor the condition nor value of the land.
Jarvis R. Burrows went to one Gonigam, a real estate
agent in Ottawa, told him the company had a half sec-
tion of land in South Dakota and needed money, and
that some one in Chicago was talking of buying it, but
was too slow, and asked him to make Merrifield an
offer of $2,000 for it, and told him he would furnish the
money and would pay him $500 for his services if he
got the land for $2,000. Gonigam wrote to an acquaint-
ance in South Dakota and learned that the land would
be "a great snap" at $3,500 and told this to Jarvis R.
Burrows. Gonigam then told Merrifield he had a
party who would give $2,000 for this South Dakota
land. Merrifield asked Thomas W. Burrows what he
thought about it and the latter referred Merrifield to
Jarvis R. Burrows and told Merrifield that Jarvis had
seen the land. Merrifield reported the offer to Jarvis
R. Burrows and asked him how much land there was
and what he thought of the offer, and the latter replied
that there were 200 acres, and that it was worth per-
haps a little more than $2,000 and advised him to try
and get a little more. Merrifield then offered Gonigam
the land for $2,500. Gonigam replied that his party
would only pay $2,000. Merrifield told Jarvis R. Bur-
rows of this, and the latter advised him to accept the
offer. By direction of Jarvis R. Burrows, Gonigam
prepared a deed with the name of the grantee in blank,
which was duly executed and delivered to Gonigam.

Jarvis R. Burrows gave Gonigam $2,000 in currency and the latter deposited the same in the bank, and delivered to the company his own check for $2,000 and received the deed. He then delivered the deed to Jarvis R. Burrows with the name of the grantee in blank, and Jarvis R. Burrows paid Gonigam $500 for his services. These facts had become known to the Merrifield family before the meeting of January 7, 1908, hereafter referred to. Soon afterward they made such investigations as showed that there were 320 acres of land, with a house, barn and granary upon it, and that it was worth from $18 to $20 per acre, or from $5,760 to $6,400. When Jarvis R. Burrows initiated and conducted this transaction, by which he caused the company to convey, and himself to acquire secretly, property with which he was acquainted and the president of the company was not, and at about one-third of its value, he was an officer of the company and was receiving from it a salary of $2,500 per annum for his services to it. The only substantial reply to this proof of his unworthy and fraudulent conduct is to charge Merrifield and George R. Wood with being also guilty of improper conduct towards the company in financial matters. When all the facts are examined those counter charges appear to be groundless. The company had a power boat used to haul logs on the Illinois & Michigan canal. It ceased to be useful to the company and had not been used for a year, and its machinery had become rusty from disuse, and Merrifield offered to buy it for $800, which was much less than it had cost. This was originally agreed to and, as he understood, with the approval of the Burrows brothers. When he found that they were dissatisfied he refused to buy it, and the company still owns it. Wood was a clergyman. When the troubles with the Burrows brothers became imminent, he removed to Ottawa and was appointed general superintendent of the company at a salary of $2,500 per year. Defendants make bitter comments upon this, and scout the idea that the services of a

clergyman could have any such value to the company.
It was the same salary which the company was then
paying Thomas W. Burrows, a physician, and Jarvis
R. Burrows, a lawyer. But the proofs further showed
that while the Burrows brothers had never had any
experience in a business of this kind, Wood had spent
several years in mechanical pursuits before he became
a clergyman, and had spent about fourteen months in
the different parts of this plant while it was under the
control of Leonard B. Merrifield, its founder, and was
familiar with his method of conducting the business,
and had been a director in this company and its prede-
cessor for nine of the last preceding ten years. At
that time the Merrifield family, experienced in the
business, had but one salaried office, while the Bur-
rows brothers, new to the business, had two. But still
further, when Wood found that the Burrows brothers
were opposed to his acting in that capacity he declined
to accept the office, and he never received the salary.

December 28, 1907, was the date fixed by the by-laws
for the annual meeting of the stockholders. The stock
was then held as follows: Mrs. Mary C. Merrifield, the
widow of Leonard B. Merrifield, owned 150 shares;
Louis W. Merrifield owned 180 shares; the daughter,
Lilla M. Wood, owned 150 shares; her husband, George
R. Wood, owned 20 shares. This amounted to 500
shares, or one-half of the capital stock. Thomas W.
Burrows and Jarvis R. Burrows each owned 250
shares. Jarvis R. Burrows had acquired his through
his brother Thomas. As already stated, the Burrows
brothers had acquired this stock wholly or chiefly from
the Merrifield family, and it was largely unpaid for,
and they were not in possession of the certificates
therefor, but all the stock the Burrows brothers owned
was pledged with Mrs. Mary C. Merrifield to secure an
indebtedness of about $30,000 from them to her. Sec-
tion 24 of our statute concerning corporations author-
izes the pledgor of stock to vote thereon as stockholder
at all meetings. Each stockholder was present at that

annual meeting. For the year then ending the officers
had been Louis W. Merrifield, president; Thomas W.
Burrows, vice-president and treasurer, and Jarvis R.
Burrows, secretary, and their term of office was "one
year or until their successors shall be named," as the
by-laws provided. The president called the annual
meeting of the stockholders to order. This was in
direct compliance with a by-law. Nominations were
made for chairman of the meeting. A controversy arose
as to whether each stockholder could cast one vote only
for chairman or whether each could cast as many votes
as he or she held shares of stock. The Merrifields had
four stockholders present and the Burrows brothers
two, and by the former method the Merrifields could
elect the chairman. The proof shows that at all previ-
ous stockholders' meetings within the memory of the
members of the Merrifield family then present, while the
vote upon the election of directors had been by shares,
yet on all other questions each stockholder had cast
one vote, and that this course had been pursued at all
previous stockholders' meetings attended by the Bur-
rows brothers, and that no objection or question as to
the legality or propriety of that course had ever been
made by any one before December 28, 1907. At that
meeting Jarvis R. Burrows insisted that every ques-
tion should be voted upon by shares of stock. By an
unanimous vote the meeting adjourned to January 7,
1908, in order to enable the president to take legal ad-
vice on that subject.

On January 7, 1908, the adjourned annual stockhold-
ers' meeting convened at a room called the directors'
room, on the second floor of the office of the company
at its factory in Ottawa, being the place fixed by the
by-laws for the meeting. The president called the
meeting to order. Mrs. Merrifield nominated George
R. Wood for chairman, and Thomas W. Burrows nomi-
nated Jarvis R. Burrows. The president held that
each stockholder present was entitled to one vote for
chairman. He put the motion to nominate Wood, and

four of the six stockholders present voted for the motion, and the president declared Wood elected and he took the chair. The Burrows brothers voted against the motion, and announced that they voted their 500 shares against it. Wood acted as chairman. There was much angry discussion. Jarvis R. Burrows read many protests and other documents which had been previously prepared. The minutes of two previous meetings were approved by a *viva voce* vote, against the protests of the Burrows brothers to that method of voting. A vote by shares of stock was had for directors for the ensuing year. There were five directors to be elected. The Merrifield family cumulated their 500 shares upon three names. The Burrows brothers cumulated their 500 shares upon three other names. The vote was a tie and there was no election. The preponderance of the proof shows that there was then some delay and silence; that no one requested another ballot for directors nor brought forward any other business. A motion to adjourn was then made and put to a *viva voce* vote by the chairman. Four stockholders voted for the motion and two, the Burrows brothers, against it. The chairman declared the motion carried, and the meeting adjourned. Defendants claim that Jarvis R. Burrows then said, "We will consider the stockholders' meeting still in session." The proof upon that subject will be considered later.

A meeting of the board of directors was then convened and called to order by President Merrifield. The by-laws provided that there should be two regular meetings of directors each year, the first of which should be held immediately following the annual meeting of the stockholders and on the same day. The old board of directors consisted of Louis W. Merrifield, Mary C. Merrifield, George R. Wood, Thomas W. Burrows and Jarvis R. Burrows, and they were all present and all participated in the meeting, and each of them voted upon various propositions submitted to a vote at that meeting. It is a debatable question whether this

old board of directors could elect the officers of the company for the ensuing year, but we regard it as not subject to question that, as all the directors were present, this was a lawful meeting of the directors, and that they could transact the general business of the company at that meeting. Section 20 of our statute governing such corporations provides in effect, that when all the directors are present at any meeting, however called or notified, the acts of such meeting shall be as valid as if legally called and notified, if held within this State. In Cook on Stock and Stockholders, 2d Ed., section 620, and in 1 Cook on Stock and Stockholders, 3rd Ed., section 624, the law is stated to be that "the old directors continue in office until their successors are duly elected." It is manifest that any other rule would be ruinous to a corporation which for any reason failed to hold its annual stockholders' meeting at the prescribed time or, as here, whose stockholders are equally divided in opinion and are unable to elect anyone. In this State the stockholders cannot conduct the business of the corporation nor elect officers (except directors) nor can they make or amend by-laws. Therefore, directors must continue in office till their successors are elected, or else the business of the corporation must cease, if their term expires and for any reason the stockholders have failed to elect their successors. We therefore hold that these directors did not go out of office when the annual stockholders' meeting failed to elect directors for the ensuing year. At properly called meetings of directors the majority in number present controls if a majority of the board is present, and a majority carries any proposition submitted to vote, unless some statute or by-law requires more than a majority. When all the members are present no call is necessary. The by-laws authorized the president to call meetings of directors to order and to preside thereat. This was done here. The minutes of previous meetings were read and approved. A resolution was adopted, fixing the salaries as hereinbefore stated.

The by-laws required that the salaries of officers should be fixed annually by resolution of the board of directors. The year for which the president, vice-president, treasurer and secretary were elected had expired. We do not doubt that this board of directors could lawfully take this action. It may be that if the stockholders had afterwards held another meeting and elected a new board of directors, the latter could rescind this action and fix other salaries before electing officers, but unless that was done this action fixing salaries would stand. Other action relative to the business of the company was proposed and carried by a majority vote at this meeting.

The action of which defendants chiefly complain is that the board at that meeting entered upon the election of officers for the ensuing year and elected Merrifield president, and Wood vice-president. No nominations were made for secretary and treasurer and those offices were not filled. Ever since the Burrows brothers had been stockholders the course pursued by unanimous consent had been that the Merrifield family, who owned one-half the stock and held the other half as collateral security as above stated, should hold three of the five directorships and the office of president, which included general manager, and that the Burrows should hold the offices of vice-president and secretary and treasurer. The Merrifields had thus held the majority of the directors and the Burrows brothers the majority of the other offices. Much friction had arisen because of the acts of Thomas W. Burrows, the vice-president, when acting as president in the absence of Merrifield, and also when Merrifield was at home and able to perform the duties of president himself. The Merrifield family seem to have decided at this meeting that they would also control the office of vice-president. Having elected the president and vice-president, they were ready to concede the offices of treasurer and secretary to the Burrows brothers, but no nominations were made for those offices and there-

fore no vote was taken. If this was a valid election of officers then Merrifield became president and general manager and Wood vice-president by that election, and Thomas W. Burrows held over as treasurer till his successor should be elected, and Jarvis R. Burrows held over in like manner as secretary. If this was not a valid election of officers, then the old officers held over and Louis W. Merrifield was still president and general manager, Thomas W. Burrows, vice-president and treasurer, and Jarvis R. Burrows secretary.

The by-laws provide that the officers shall be chosen by the board of directors and shall hold office for one year or until their successors are chosen, and provide for two regular meetings of the directors, the first on the same day as the annual meeting of the stockholders and immediately following such meeting, and the second on the second Tuesday of June. It seems that by an amendment to the by-laws regular monthly meetings of the board of directors were also provided for. The by-laws do not provide that the officers shall be elected at the regular directors' meeting to be held immediately after the regular stockholders' meeting, though that was the practice and was probably intended. The by-laws do not provide that the officers for the ensuing year cannot be elected till the new board of directors is chosen. The regular annual stockholders' meeting of this company convened at the date fixed by the by-laws, adjourned to January 7, 1908, and then convened and found that no business could be transacted, and then adjourned without fixing a date for a further meeting, and thereby that annual stockholders' meeting was terminated if the vote to adjourn was lawfully carried, of if, after the vote to adjourn was irregularly adopted, all the stockholders left the place of meeting, which we shall hereafter see was the fact. The annual stockholders' meeting was therefore terminated, and the old board of directors was left in office, with no probability that their successors would soon be chosen. If one of the officers had thereafter

died or resigned, we do not doubt that this old board of directors could have filled that vacancy. This board of directors continued to be the governing body of the corporation. We know of no rule of law which gave them any less power and authority, after the expiration of the year and while they still remained directors because of the failure to elect their successors, than they had during the year for which they were primarily elected. They were only elected to serve one year, but they were also elected to serve till their successors were chosen. In 2 Cook on Stock & Stockholders, 3rd Ed., section 713, it is said: "An officer who holds over by reason of the failure of the corporation to elect his successor is not only a *de facto* but a *de jure* officer." There is therefore strong reason for holding that this board could elect officers on January 7, 1908, when they were in session. If they could, then Merrifield was duly elected president for the year 1908. If they could not, then he was still in office as president and general manager by virtue of the election of the preceding year, as his successor had not been elected. Therefore, when this directors' meeting adjourned on January 7, 1908, Merrifield in any event was still the president of the complainant corporation, and he still holds that position, unless he was deprived of that office by what occurred later on that day.

The Burrows brothers had brought a stenographer with them who remained through the two meetings already described and took notes of part of what was said and done, and transcribed those notes and attached the transcript to his affidavit filed by defendants, and swore to its correctness. It is not contended that he took down all that was said and done. Indeed, when it was requested at the meeting in behalf of the Merrifield interests that what was done be correctly taken down by the stenographer, Jarvis R. Burrows replied that the stenographer was acting for him and would take down what he directed. These minutes show that after the chairman had declared the stock-

holders' meeting adjourned, Jarvis R. Burrows said:
"We will consider the stockholders' meeting still in
session." The proof introduced by defendants tended
to show that this statement was made in a loud voice
and that, during the directors' meeting which fol-
lowed, both Jarvis R. Burrows and Thomas W. Bur-
rows stated plainly and loudly that they considered the
stockholders' meeting not lawfully adjourned, but still in
session. The proof introduced by complainant tended
to show that no such language or notice was heard by
any member of the Merrifield family present, nor by
Duncan McDougall, who was present as their legal ad-
viser. Mrs. Lilla M. Wood was not a director, and when
the stockholders' meeting adjourned she went down
stairs and waited in the office below for the conclusion
of the directors' meeting. After that meeting ad-
joured Merrifield, Wood, Mrs. Merrifield, McDougall
and the stenographer went down stairs, put on their
overcoats and wraps, and with Mrs. Wood left the
premises. The sharply controverted question of fact
is whether Thomas W. Burrows and Jarvis R. Bur-
rows came down stairs with the others. We have care-
fully studied the evidence on this subject. We cannot
see into the hearts of these witnesses and know with
absolute certainty who told the truth. We can only
judge by those surrounding facts and circumstances,
including the number of witnesses testifying to the one
or the other contention, which induce reasonable per-
sons to conclude that one version is true rather than
the other. To repeat in detail what each witness
stated and each reason which inspires confidence in one
statement more than another would extend this opin-
ion to an unreasonable length. The evidence leads us
to the conclusion that the members of the Merrifield
family and the solicitor were not given to understand
when they left the room, or before they left it, or be-
fore they left the building, that it was claimed by the
Burrows brothers that the stockholders' meeting had
not adjourned and was still in session, or was to con-

tinue in session, and that they left the building in entire ignorance of the existence of any such claim or intention on the part of the Burrows brothers. We also conclude from the evidence that Thomas W. Burrows and Jarvis R. Burrows came down stairs with the others as if to leave the building, and that no stockholder remained at the place where the meeting had been held; that Thomas W. Burrows put on his overcoat, and that they allowed the stenographer to leave the premises; and that all this was done to prevent the Merrifields from having any suspicion of what they intended to do. We are also of opinion that when all the stockholders had left the room and the story of the building in which the stockholders' meeting had been held, that meeting stood adjourned and abandoned, even if the motion to adjourn that meeting was irregularly put to vote and was not lawfully adopted.

At common law each stockholder in a private corporation had but one vote at a stockholders' meeting, no matter how many shares he owned. 1 Cook on Stock and Stockholders, section 609. It was held in Taylor v. Griswold, 2 Green (N. J.) 232, that at the meeting of stockholders of a bridge company the vote is carried by the majority of the corporators present and voting in person, where the charter is silent and the subject is not regulated by the by-laws. Section 3 of our statute concerning corporations gives a stockholder the right to vote in elections for directors for the number of shares owned by him and also to cumulate such shares and votes. If the statute had intended that all voting at stockholders' meetings should be by the number of shares it would seem natural that it would have been so provided in that section. Counsel have not called our attention to any decision upon this subject in this state. In other states, however, it is held that the majority in interest at a stockholders' meeting should control, or in other words that the voting should be by shares of stock. This is recognized in Weinburgh v. Union Street Ry. Adv. Co., 55 N. J. Eq.

640, where Taylor v. Griswold, *supra*, was distinguished as a case where personal duties were imposed upon stockholders, requiring their personal action. Hays v. Commonwealth, 82 Pa. St. 518, was a case where the charter gave the stockholder one vote for each share of stock at general meetings of stockholders. That rule was applied generally in Baker's, Appeal, 109 Pa. St. 461. In Procter Coal Co. v. Finley, 98 Ky. 405, it was held that the common law that each stockholder was entitled to but one vote was not applied to present day business corporations, especially if the corporation adopt a by-law authorizing a vote for each share of stock. The constitution of Kentucky recognized the right of voting by shares. The text books generally state it as a principle of modern corporation law that each stockholder is entitled to one vote for each share of stock owned by him. In examining cases cited to support that doctrine it will be found that they frequently rest upon the constitution, or upon a statutory provision or upon a by-law of the corporation adopted by authority. Our constitution (section 3 of Article 11) only gives the stockholder the right to vote the number of shares of stock owned by him, or to cumulate said shares, in the election of directors or managers. While the question thus appears to be an open one in this state, we are of opinion that on principle the voting should be by shares of stock, and that the rulings by the president and the chairman of the stockholders' meeting of January 7, 1908, were incorrect. But it is also obvious that no harm was done to defendants thereby. If the president had put the nomination for chairman to vote by shares of stock no chairman would have been elected, and the meeting would never have organized, and perhaps would not have required a motion to adjourn. No business could have been transacted at that meeting, in view of the determined stand taken by each party. If a motion to adjourn could not have been carried, still they must have abandoned the effort to

hold the meeting when their physical endurance was exhausted. Nothing was accomplished at the meeting as it was actually held. Nothing would have been accomplished at the meeting if the stockholders had been permitted to vote by shares of stock upon every motion. We hold that the departure of all the stockholders from the directors' room and from that story of the building was an abandonment of any attempt to hold a stockholders' meeting.

After the Merrifields and their solicitor and the stenographer had left the premises and had gone to their homes and places of business, the Burrows brothers went back up stairs to the meeting room; called two employes to witness what was done, and then proceeded to hold a stockholders' meeting with Thomas W. Burrows presiding as vice-president, voted 500 shares each for Thomas W. Burrows, Jarvis R. Burrows, Agnes J. Burrows, John H. Williams and Edward S. Jacobs as the directors for the ensuing year, and declared them elected. Agnes J. Burrows is the wife of Thomas W. Burrows. The briefs say that Jacobs is her brother. Williams testified that he was an employe of the company, but the briefs of complainant treat him as a discharged employe, and there is other proof that he was not then in the service of the company. Burrows then telephoned for Mrs. Burrows. She came promptly, and they then held a pretended directors' meeting, with the Burrows brothers, Mrs. Burrows and Williams present, and they elected Thomas W. Burrows president and treasurer, Jarvis R. Burrows secretary, and Agnes J. Burrows vice-president. Agnes J. Burrows and Williams and Jacobs were not stockholders. The by-laws had provided that the directors should be stockholders. While the certificates for all the shares of stock owned by the Burrows brothers were in the possession of Mrs. Merrifield to secure their debt to her, they could not transfer part of them to others so as to increase the number of stockholders favorable to the Burrows brothers

whom they could elect as directors. If they should have an opportunity to control such a pretended stockholders' meeting as that now under consideration, they would still be obliged to elect a majority of the directors out of the other stockholders, namely those of the Merrifield family. In apparent anticipation of the situation now under consideration, Thomas W. Burrows while still in the confidence of the Merrifield family, moved an amendment to the by-law on the subject of directors, and that motion was adopted. That amended by-law omitted the requirement that the directors should be stockholders. That laid the foundation for the action of this pretended stockholders' meeting by which the majority of the directors declared elected, and to whom it was proposed to commit the control of the property and business of this company, were not stockholders and had no financial interest in it. But for the adoption of this amended by-law on the motion of Thomas W. Burrows, this pretended stockholders' meeting, if it elected directors at all, must have selected the majority of them from the stockholders of the Merrifield family. Having thus, so far as it could, turned the affairs of this company over to a board whose majority owned no stock in it, the meeting took some other action concerning the business of the company and then adjourned. We are of opinion that the defendants intentionally deceived the stockholders of the Merrifield family and their solicitor in order to enable the defendants to seize the control of this corporation. There is proof that when they came down stairs the last time Jarvis R. Burrows said: "We have them fixed now," and that two days later Thomas W. Burrows said, while at the factory: "All of Louis W. Merrifield's money is in this business here. When we get through with Louis W. Merrifield he will not have two dollars to rub together." In 1 Cook on Stock & Stockholders, 3rd Ed., section 601, it is said that "where there is an absence of good faith, and an adjourned meeting is held in such a way as to prevent

certain of the stockholders from knowing it, the proceedings are invalid.'' We are of opinion that this later attempted stockholders' meeting was intentionally concealed from half of the stockholders, and that it was fraudulently held and is invalid; that the five parties there selected as directors were not lawfully elected to that office; that the pretended directors' meeting held immediately thereafter was wholly a void proceeding, and that the persons there named as officers were not thereby made officers of the complainant. The proof shows that the others officers of the complainant and the members of the Merrifield family did not know of the holding of these meetings and of these alleged elections till January 9. On that day Thomas W. Burrows came to the factory, posted notices signed by him as president, announced changes of rules, and notified employes to pay no further attention to the orders and directions of Merrifield but to come to him therefor, and took possession of the mail of the company and refused to deliver it to Merrifield or to advise him of its contents. Thereupon on the same day this bill was filed and this injunction was issued.

It is argued that this is in reality a suit between Merrifield and Thomas W. Burrows to try the title to the office of president; that *quo warranto* is the form of action at law in which such a controversy must be tried; and that equity has no jurisdiction to determine that question. If the title to an office is the only matter involved, equity will not take jurisdiction. Lawson v. Kolbenson, 61 Ill. 405, 418. Where, however, the title to an office in a private corporation is necessarily involved in a case properly before a court of equity, the court will determine it, with all the other questions in the case, in order to give perfect relief. Chicago Macaroni Co. v. Boggiano, 202 Ill. 312, 316. Nothing in the bill raised any question of the title to the office of president. The bill alleged that Merrifield was president; that he had been elected for the year 1907 and again on January 7, 1908, for the year 1908, and that

Thomas W. Burrows and Jarvis R. Burrows were directors and were holding over as treasurer and secretary respectively; that they were conspiring to injure the business of complainant; that they were usurping the duties and functions of the office of general manager, which office was held by the president by virtue of the by-laws; that they were interfering with and obstructing Merrifield in the performance of his duties as general manager so as to seriously injure complainant's business; that on the day the bill was filed Thomas W. Burrows secreted the mail of the complainant so that Merrifield as president and general manager could not know what the same contained, and refused to produce the same when requested; that Thomas W. Burrows for the purpose of disorganizing the business of complainant, on the morning of said day placed notices on the walls of the working compartments of complainant, changing the working hours of the employes, and signed his name thereto as president of complainant; that said Thomas W. Burrows has usurped the functions and installed himself in the office of president and general manager and is performing the duties of president and general manager for the purpose of disorganizing the business; and that he gave orders to the foreman and discharged several employes and re-employed certain agents whom Merrifield had laid off. The bill contained many charges that Thomas W. Burrows and Jarvis R. Burrows were endeavoring by these means to ruin the business and financial standing of complainant and to prevent its paying its debts. The bill contained no suggestion that either of the defendants claimed any title to any office which would authorize them to thus meddle in the business of the company. The evidence sustained these allegations. The answer set up that defendants were doing this by virtue of a stockholders' meeting and a directors' meeting held on January 7, 1908, under the circumstances already narrated. The bill and the evidence to support it made a case for complainant. De

fendants set up an alleged title to office to justify their conduct, which conduct was wholly unwarranted unless the meetings which they set up in their answer were legal and valid. It is obvious that the ability of this company to do business was at stake. We are of opinion that the company had a right to call upon a court of equity to protect it from the actions of the defendants, if they were in fact acting without authority of law. The proof shows that they were unlawfully interfering with its management in a manner which would be destructive of its business life. It had a right to call upon a court of equity for protection. It is not shown that the corporation had not given Merrifield, as its president, authority to begin this suit in its name, and it is a general rule that a corporation acts through its president, and in the absence of proof to the contrary he will be presumed to have authority to represent the corporation. Jones & Dommersnas Co. v. Crary, 234 Ill. 26. Indeed, if this right to file the bill had been disputed, it would have been necessary for the court to hear the proofs of what occurred on January 7, 1908, and to determine the legal effect of all that action, in order to ascertain whether the corporation could act through Merrifield in filing this bill. Moreover the proof is that the records of the company show due authority to institute this suit.

There was another ground of jurisdiction stated in the bill. It not only showed that defendants were pursuing a course of conduct calculated to destroy the financial standing of complainant, but it also charged that defendants were insolvent and therefore incapable of compensating the corporation in damages for the injury they were inflicting. It is argued that as the bill states that defendants owned 500 shares of the capital stock of complainant and that these have a very considerable value, this negatives the charge that defendants were insolvent. This position is untenable. That statement was made in giving the names of the stockholders and the number of shares each owned.

The bill did not state that they had paid for these shares nor what other debts the defendants owed. The proof shows that these shares are all pledged to and in the possession of Mrs. Mary C. Merrifield to secure the debt of defendants of about $30,000 to her; that defendants owe about $85,000 and that they have no property subject to execution. Merrifield's affidavit is that defendants owe "other people" more than $85,000. The proof tends to show that they owe the complainant company and Mrs. Merrifield over $60,000. If the words "other people" mean "besides the two last named," then their indebtedness exceeds $145,000. Defendants do not disclose any property except this pledged stock. The value of these shares is very problematical in view of the course of conduct pursued against complainant, calculated to destroy its business and financial standing.

But it is a question whether defendants can now assail the jurisdiction of the court. On the day after defendants filed their answer they filed what they called a petition, and secured an injunction against the company and its directors from electing a treasurer and a secretary of the company for the ensuing year, pursuant to a notice by Merrifield as president, calling a special meeting of the board of directors for that and other purposes. It is a general rule that an injunction is only issued upon a bill or cross-bill in equity. Bryant v. The People, 71 Ill. 32; 2 High on Injunctions, section 1566. It is stated in the work last cited that where a court of equity is already in possession of a cause and has jurisdiction of both the subject-matter and of the parties, it may enforce obedience to its mandates by an injunction issued merely upon a petition in the cause, without the filing of a bill. The pleading by defendants upon which they obtained the injunction referred to either confessed in effect that the court already had jurisdiction of that subject-matter, or else it was in reality a cross-bill. In either event, defendants thereby sought and

obtained relief similar in principle to that sought by complainant, and after they had sought and obtained such relief, their right to question the jurisdiction of the court to grant such relief is doubtful.

We are of opinion that the proof in this record sustained the allegations of the bill and warranted the court in refusing to dissolve the injunction. We think it proper, however, to say that inasmuch as these conclusions are based upon affidavits drawn *ex parte,* we shall not feel bound thereby in any future hearing of this case upon the merits, if a cross-examination of the witnesses shall materially change the tenor of the testimony. For the reasons stated the order is affirmed.

*Affirmed.*

Per Curiam. In their petition for a rehearing appellants complain that the language of the court in describing their conduct is too severe, in view of the fact that the motions were heard mainly upon affidavits and documentary evidence. They say that when, upon a final hearing, the witnesses are cross-examined and when appellants offer other proof which they possess but did not present at the hearing now under review a very different complexion will be given to many of the transactions described in the opinion. We think we sufficiently guarded against that contingency at the close of the opinion. Motions in chancery cases are usually heard upon affidavits, and such a case upon appeal must be discussed upon the proofs which were presented to the court below. It would not have been permissible for us to say that while the conduct of appellants with reference to the corporation seemed highly improper, yet we would not discuss or act upon what the record disclosed because upon the cross-examination of witnesses and the production of other proof at a final hearing a different state of facts might appear. We must discuss the case upon such a record as the parties present. If they

have failed to present the real facts, we cannot assume or guess that the record is untrue, but must take it as it is. Appellants say in their petition for a rehearing that they did not receive the dividends referred to in the foregoing opinion, and that the record does not disclose that they received them. On page 87 of the abstract filed by appellants, in an affidavit read in evidence, is the statement that on March 6, 1906, on motion of Thomas W. Burrows a dividend of fifty per cent. was declared, and that of that dividend "said Thomas W. Burrows and said Jarvis R. Burrows *were paid* on the stock then held by them, being fifty per cent. of all the stock of said corporation, the sum of $25,000;" that on December 28, 1906, at a meeting of the directors, upon the motion of Thomas W. Burrows, a further dividend of twenty per cent. was ordered and paid, and that "said Thomas W. Burrows and Jarvis R. Burrows then owned fifty per cent. of said stock and *received* the sum of $10,000 thereon." The next sentence relates to the next dividend of ten per cent. and is less specific, but implies that it was paid in the same way. The record before us therefore contained positive proof that appellants *received* these dividends. If that statement was in any respect incorrect or inexact or incomplete, or if, as now alleged on petition for rehearing, the pledgee of the stock actually received these dividends upon the debt for which the stock was pledged, appellants should have introduced proof upon that subject. Some of the facts stated by us in reference to the indebtedness of appellants for the capital stock were derived from part of an answer of L. W. Merrifield and others in another chancery suit, read in evidence in this case. The answer had not been sworn to, but it was referred to in an affidavit of L. W. Merrifield in this case, and we treated it as incorporated in that affidavit. It is insisted that the language of that affidavit was not sufficient to make the answer a part of it, but, though the affidavit could have been made plainer, we are

clear that it was intended to incorporate that part of the answer in the affidavit. We have considered the other points urged in the petition for a rehearing and they do not change our conclusion. Where the affidavits were conflicting we examined all of them and stated our judgment as to what was proved, but it would have extended our opinion to an intolerable length to state, in detail, the testimony of each witness and to give our views as to the weight to be accorded to each. We adhere to our conclusion upon the proofs contained in this record. The petition for a rehearing is denied.