## Mary C. Merrifield et al., Appellees, v. Thomas W. Burrows et al., Appellants.

### Gen. No. 5145.

1. Corporations—*how dissolution may be effected.* In this state a corporation cannot be dissolved by a court of equity except under section 25 of the act concerning corporations.

2. Corporations—*power of chancery to appoint receivers.* Section 25 of the Corporation Act does not deprive courts of equity of the authority to appoint receivers for solvent corporations where the facts are such that the appointment is within the ordinary powers of a court of equity.

3. Corporations—*jurisdiction of chancery to appoint receivers.* While courts of equity have the power to appoint receivers for solvent going corporations, they will not ordinarily take such action but will usually decline to assume control of the affairs of such corporation. *Held,* however, that from the facts set up in the bill in this case an extreme necessity had arisen and that the injunction granted restraining the holding of a particular stockholders' meeting and of all other stockholders' meetings until the further order of the court and appointing a receiver for the defendant corporation (which was a solvent going concern), were as well within the jurisdiction of equity as calculated to serve the best interests of the property and the parties in question.

4. Chancery—*effect of inappropriate prayer upon relief as a whole.* All relief will not be denied to complainants because one part of the prayer cannot be granted under the facts stated in the bill.

Bill in equity. Appeal from the Circuit Court of La Salle county; the Hon. S. C. Stough, Judge, presiding. Heard in this court at the April term, 1909. Affirmed. Opinion filed March 11, 1910. Stricken from rehearing docket April 13, 1910.

Eddy, Haley & Wetten and Butters & Armstrong, for appellants.

Duncan, Doyle & O'Conor and C. B. Chapman for appellees.

Mr. Presiding Justice Dibell delivered the opinion of the court.

On January 2, 1909, the Western Cottage Piano and

Organ Company, hereafter called the Company, and Mary C. Merrifield, Louis W. Merrifield, George R. Wood, and Lilla M. Wood, owners of one half of the capital stock of said corporation, filed a bill in equity against Thomas W. Burrows and Jarvis R. Burrows, owners of the other one half of said capital stock. The bill contained a separate prayer by the Company that its co-complainants and the defendants be enjoined from holding or prolonging a certain meeting of the stockholders of the Company, then in session, and from electing or attempting to elect at that meeting or at any time thereafter any directors or officers for said Company, and from interfering with the management and control of said Company's business, till the further order of the court. All the complainants prayed for the appointment of a receiver to take charge of the property of the Company and to continue its business till the further order of the court. The injunction was granted immediately and without notice, and by agreement of complainants and defendants the motion for a receiver was set for January 4, 1909, on which date there was a hearing and a receiver of the property of the corporation was appointed, with directions to proceed to conduct the business of the corporation which was the manufacture and sale of pianos and organs. The person appointed receiver was agreed to by all the parties as a suitable person. Defendants appealed from the injunction order and perfected that appeal by the filing of a bond. They also appealed from the order appointing a receiver and perfected that appeal by the filing of another bond. One record has been filed here embracing both appeals, and the assignment of errors covers both appeals, and the appeals have been treated as if consolidated.

The bill prays, among other things, for the dissolution of the corporation. The authorities cited by appellant are conclusive that in this State a corporation cannot be dissolved by a court of equity except under section 25 of the Act concerning corporations.

Hurd's R. S. 1905, chap. 32, sec. 25. The corporation here involved is a solvent one, and the purport and tenor of the bill and of the other prayers therein is to carry on its business and save it from destruction. The bill does not state a case authorizing the dissolution of the corporation under said section 25. That portion of the prayer of the bill must be disregarded. The bill prays for an injunction and for a receiver, as above stated, and to have the business carried on and also for other and further relief as equity may require. We are of opinion that complainants should not be denied all relief because one part of the prayer cannot be granted under the facts stated in the bill. It is clear from the authorities that in this State courts of equity will not readily grant a receiver for a corporation when the case made therefor is not under section 25 of the Corporation Act. We are of opinion however that it was not intended by these authorities to hold that courts of equity have been deprived by that Act of the authority to appoint receivers for solvent corporations where the facts are such that the appointment is within the ordinary powers of a court of equity but for said section 25; in other words, that said section 25 is not to be construed to mean that the ordinary jurisdiction to appoint a receiver has thereby been withdrawn. In 23 Am. & Eng. Encyc. of Law 2nd. Ed. 1002, the general authority of a court of equity to appoint a receiver is thus stated: "The appointment of a receiver is a remedy of purely equitable origin, having originated in the English Court of Chancery, where it has been employed from a very early time. It is indeed one of the oldest equitable remedies, and grows out of the inherent power of a court of equity to afford relief where the remedies to be obtained in the courts of ordinary jurisdiction are inadequate. From its origin in English chancery, where all the leading principles in relation to its exercise were well established long before the American Revolution, the power to create a receivership has

naturally and regularly descended to, and become one
of the inherent powers of, all courts exercising an
equitable jurisdiction.''

On page 1004 of the same volume, after stating that
it has been held in some jurisdictions that a court of
equity has no inherent power to appoint a re-
ceiver for a corporation and therefore cannot do so
without a statute, the authority thus continues: ''But
the power to appoint a receiver *pendente lite,* with
power merely, to care for and preserve the property
committed to his charge, is one incidental to the juris-
diction of a court of equity. It does not and never did
depend upon statute, nor upon the character of the
parties, whether individuals or corporations, nor upon
the nature of the property. In most states the equit-
able powers of courts have been enlarged by statutes
conferring express jurisdiction to appoint receivers
over incorporated companies. Such statutes are
strictly construed, and the appointment of a receiver
usually rests within the sound discretion of the court.''

In 1 Morawetz on Private Corporations, 2nd. Ed.
section 281, that authority says: ''A court of equity
will grant all relief to a shareholder which the nature
of his case may require. But it has always been a
settled principle, that no interference with the man-
agement of a corporation can be justified, unless such
interference be absolutely necessary to the attainment
of justice.  *  *  *  Nor can a court of chancery in-
terfere at the suit of a portion of the shareholders
and remove an offending officer, or even enjoin him
generally from acting for the corporation, unless this
be essential to the protection of the corporate rights;
as, for example, where the directors have conspired to
defraud the corporation, or have otherwise shown
themselves to be totally unfit to be intrusted any
longer with the management of the company's affairs.
The court must ordinarily confine its remedy to the
redress of the special wrongs which have been charged.
The appointment of a receiver or manager of a *solvent*

corporation must therefore be considered a strong remedy which can be justified only in a strong case; and the management of the corporation should be restored to its shareholders as soon as this can be done with safety. Thus, in Featherstone v. Cooke, Vice-Chancellor Malins appointed a receiver for a company because disputes had arisen between its managing agents, which caused a stoppage of the business and threatened to entail great loss upon the shareholders; but he discharged the receiver as soon as a general meeting of the shareholders had been called and new officers had been chosen."

Again in section 543, of the same work, the rule is thus stated: "Cases may arise in which the removal of the directors of a corporation would be essential to the company's welfare. Thus, the directors may be wholly unable or unwilling to perform their duties and protect the interests of the shareholders; they may even threaten the company with wilful mismanagement and financial ruin. Under these circumstances some remedy must be found. It has been pointed out in a preceding chapter, that the courts will grant relief, at the suit of individual shareholders of a corporation, whenever the company is unable, by reason of the fault of its agents, to maintain its rights. Hence, if the removal of the directors is absolutely essential to the protection of the corporation, and the corporation has no means of removing them or of revoking their powers, individual shareholders may apply to the court on behalf of the company, and the courts will grant such redress as justice requires. * * * It would seem, therefore, that a court of equity may remove the directors of a corporation from office at the suit of the corporation or a shareholder acting on its behalf, if for any reason the directors are incapable or unsuitable to perform the trust they have undertaken. It should be observed, that the courts will not remove the directors from office, or restrain them generally from representing the corporation, except in a case of absolute necessity. Ordinarily an injunction will be issued

only to restrain specific threatened wrongs. If the powers of the directors are revoked in pursuance of an order of the court, a receiver should be appointed until a meeting can be held and new directors elected by the majority.''

In Lawrence v. Greenwich Fire Ins. Co., 1 Paige's Ch. 587, the court said: ''From the facts disclosed in the bill, answers, and petition it is evident there is no person at present authorized to take charge of and conduct the affairs of the corporation. If those who own a majority of the stock neglect to elect directors to take charge of the property of the corporation, the minority are not to be the sufferers in consequence of such neglect. Under these circumstances it is proper to appoint a receiver to take charge of the effects of the company, and preserve them for the benefit of the stockholders generally. The cases of Andrews v. Powis, 2 Bro. P. C. 504, and Maguire v. Allen, 1 Ball & B. 75, fully sustain the principle that a receiver may be appointed in any case, where it is necessary for the preservation of the property pending litigation.''

In Sternberg v. Wolff, 56 N. J. Eq. 389, 39 L.R.A. 762, Sternberg and his wife owned one-half of the capital stock of a corporation and Wolff and his wife owned the other half thereof, and they elected four directors, two being selected by the Sternbergs and two by the Wolffs, and such dissensions arose that the board of directors was in a deadlock, although the corporation had a large and going business. Sternberg and his wife filed a bill to enjoin Wolff from certain things, and prayed for a receiver. Wolff came in and resisted the injunction, but consented to a receiver. The court, however, refused to appoint a receiver, but enjoined both sides in various respects. On appeal the injunctions were vacated and the court below was ordered to appoint a receiver. The court there said:

''The dissensions between these two parties—Sternberg and his wife on one side and Wolff and his wife on the other side—have brought the affairs of this company to a deadlock, so far as any corporate action

by the board of directors is concerned. It may be assumed that the court of chancery has no jurisdiction to dissolve a solvent corporation, and distribute its assets, on the ground that the business of the corporation is improperly conducted by its board of directors, even though such mismanagement be with the concurrence of a majority of the stockholders; but the jurisdiction of the court of chancery to control the business of a company, especially a trading company, pending a litigation over the management and conduct of its business, must necessarily exist; and we think, pending a litigation such as is inaugurated by the proceedings in this case, a receiver may be appointed. Corporations such as the one now before us are mere trading companies with a corporate organization, for the convenience of conducting the business for which they were incorporated. Such a corporation has not the qualities of corporations created for public purposes. No reason appears why in the matter of the control and conduct of its business the corporation and its officers should not be within the control of the court of chancery to an extent corresponding with the control of that court over the business of a mere partnership. The cases seem to establish the power of the court in virtue of its general jurisdiction to preserve the subject of litigation *pendente lite,* though it may relate to the affairs of a trading company organized as a corporation. The two cases cited by the vice-chancellor in his second opinion are to that effect. Featherstone v. Cooke, L. R. 16 Eq. 298; Trade Auxiliary Co. v. Vickers, L. R. 16 Eq. 303. In the first case the complications in the affairs of the company arose out of a division in the board of directors, which made it absolutely impossible that the affairs of the company could be conducted with advantage. Vice-Chancellor Malins in that case says: 'With regard to private partnerships, nothing is of more frequent occurrence than the quarrels of partners. If partners quarrel, oust each other from the management, or so

conduct themselves that the partnership cannot go on with advantage, it is every day's practice for the court to interfere by injunction, and appoint a receiver if necessary. With regard to public companies, I apprehend the same principle is applicable. If a state of things exists in which the governing body are so divided that they cannot act together, and there is the same kind of feeling between the members as there is frequently in the case of private partnerships, it is clearly within the rule of this court to interfere, and it will do so.' The court in that case intervened by injunction and receiver simply to protect the property of the company, to continue, however, no longer than until a governing body was duly appointed. In the latter case the dissension was also in the board of directors, one set of which closed the office doors of the company's building, and the other set, with the aid of some laborers, broke open the doors with crowbars, and forced the office open. The prayer of the bill was for the appointment of a receiver until the proper board of directors was constituted. The vice chancellor placed the affairs of the company in the hands of a receiver *pendente lite* till a new governing body was appointed. The vice chancellor's opinion states the principle to be that the court will not interfere with the internal affairs of joint stock companies unless they are in a condition in which there is no properly constituted governing body, or there are such dissensions in the governing body that it is impossible to carry on the business with advantage to the parties interested. In such a case the court will interfere, but only for a limited time and to as small an extent as possible.''

Various other authorities are there cited in further support of that position. The principles announced in the case last cited are in harmony with what is said in 10 Cyc. 1336: ''Generally speaking, corporations have the same remedies at common law, in equity and under statutes, which are accorded to individuals in like circumstances.'' In most of the Illinois cases cited the

proceeding was under section 25 of the Corporation Act, or the application for a receiver was defeated because unnecessary under the facts of the particular case. The possibility of a state of facts requiring the court to appoint a receiver for a corporation when a case under said section 25 is not made seems to be recognized in Illinois. In Baker v. Admr. of Backus, 32 Ill. 79, where an order appointing a receiver of a corporation was reversed, the court stated the general rule that "this power to appoint a receiver is most usually called into action either to prevent fraud, save the subject of litigation from material injury, or rescue it from threatened destruction." And again, "there was no necessity to appoint a receiver, because no fraud is alleged or shown and no sufficient proof that such a step was necessary to save the property from material injury or rescue it from impending destruction." In First National Bank v. Gage, 79 Ill. 207, it was held that a bill filed by certain judgment creditors against a corporation could be maintained as a bill for discovery, yet it did not warrant the appointment of a receiver. The court there said: "There is no necessity shown by this bill for the appointment of a receiver, for there is no distinct charge of fraud, nor does it appear, from the affidavits accompanying it, with clearness and distinctness, that there is any property or things in action to be preserved for the benefit of the judgment creditors. A receiver should be appointed in no case, unless it is made to appear there is an imperative necessity for the step to preserve some particular property for such parties as shall be entitled to the benefit."

In Independent Brewing Assn. v. Klein, 135 Ill. App. 234, and in the same case on appeal in Klein v. Independent Brewing Assn., 231 Ill. 594, the courts there declined to determine whether the appointment of a receiver in that case could be sustained under the general power of courts of equity when essential to the protection of property rights, because they held that the facts did not warrant the exercise of such

power if it existed. The corporation was a going and solvent concern, and the bill was not filed under section 25 of the Corporation Act. The Supreme Court said on page 620: "If, as contended by counsel for appellants, a court of equity may, under its general chancery powers, at the instance of a stockholder, appoint a receiver for the preservation of the property pending an accounting by the officers of a corporation for fraudulent misuse or conversion of its funds, the evidence shows that this is not a case where the exercise of such power was warranted. In First Nat. Bank v. Gage, 79 Ill. 207, it was said: 'A receiver should be appointed in no case unless it is made to appear there is an imperative necessity for the step, to preserve some particular property for such parties as shall be entitled to the benefit.' The Independent Brewing Association was a prosperous, solvent, going concern, and the evidence does not show that it was necessary for the preservation of the rights of appellants that it should be taken from the control of its officers, who had managed it successfully for many years, notwithstanding their wrongful conduct in the purchase of certain property. 23 Am. & Eng. Ency. of Law (2d ed.), 1023; 10 Cyc. 989-991.''

It will be seen that the court did not there deny the existence of such power in a court of equity, where absolutely necessary for the preservation of the property and the protection of the rights of its owners. While the general tenor of High on Receivers, 2d ed., section 288, is against the exercise of such power in the absence of statutory authority, yet the authority of a court of equity to appoint a receiver of a solvent corporation in extreme cases to prevent the destruction of its property is not really denied, but that authority says that courts of equity in the absence of statute, will not *ordinarily* take such action, but will *usually* decline to assume control of the affairs of a corporation. The case of Wallace v. Pierce-Wallace Pub. Co. (Ia.), 38 L. R. A. 122, which is in reality under a statute, is practically against the authority of

a court of equity to take such action, but, even there, it is only said that "this is rarely, if ever done." The court further said: "It is with great reluctance that any court authorizes the appointment of a receiver because of dissensions in the governing bodies." It remains to inquire whether the facts of this case are such as to justify the exercise of this rarely used authority.

The bill of complaint contains a detailed history of the unfortunate controversies in which the company has been involved from the time when the defendants first became stockholders down to the day when the bill was filed, January 2, 1909. This history, up to January 9, 1908, was shown in a former bill in equity by the company v. Thomas W. Burrows and Jarvis R. Burrows filed on that day, and these controversies are very fully narrated in our opinion in that cause, reported in Western Cottage Piano & Organ Co. v. Burrows, 144 Ill. App. 350. Without minutely repeating that history, which is again narrated in the present bill, we here refer to that opinion for many of those details. In some respects this bill of complaint is more definite, as, for instance, in its express averments of the insolvency of the defendants. We will here restate briefly that history down to January 9, 1908. Leonard B. Merrifield and others had conducted this business, first at Mendota, and afterwards at Ottawa, under the present and under a prior corporation, for about forty years, and at his death, in April, 1903, its assets were worth about $300,000 and its liabilities did not exceed $5,000. As he grew feeble in health, his son, Louis W. Merrifield, took active charge of the business. Thomas W. Burrows was the physician of Leonard B. Merrifield, and Jarvis R. Burrows, his brother, was a lawyer. Before Leonard B. Merrifield died it was arranged between L. B. Merrifield and the Burrows brothers that the Burrows brothers should purchase one-half of the capital stock. They purchased some from Leonard B. Merrifield, and became indebted to

him therefor in the sum of about $69,000. They bought
some stock of others, and procured Leonard B. Merri-
field to guarantee the notes which they gave therefor.
Five hundred shares of the capital stock, being one-
half thereof, were in these ways transferred to
Thomas W. Burrows and Jarvis R. Burrows, respec-
tively, on the books of the company, and all that stock
was pledged to and delivered to Leonard B. Merrifield
to secure said indebtedness of about $69,000. The
title to that indebtedness and possession of all the cer-
tificates of stock standing in the names of the Burrows
brothers passed to Mary C. Merrifield, the widow of
Leonard B. Merrifield, at his death. There is still
about $30,000 due on that note, and she still has pos-
session of all the certificates of stock standing in the
names of the Burrows brothers as security for that
note. Among the purchases of said stock made by the
Burrows brothers they bought 140 shares from one
A. H. Merrifield and paid thereon $3,600 in cash, and
gave for the rest of the purchase price the promissory
note of Thomas W. Burrows for $30,000, guaranteed
by the said Leonard B. Merrifield, who received no
part of the consideration. Thomas W. Burrows be-
came the administrator of the estate of Leonard B.
Merrifield at his death. Instead of paying said note
to A. H. Merrifield, he allowed it to be proved as a
claim against the estate of Leonard B. Merrifield in the
sum of $30,606.25, and being himself unable to pay the
debt, he induced the company to give notes, executed
by the company and endorsed by Thomas W. Burrows
and by Louis W. Merrifield, for $20,000, which notes
were discounted for $19,642.48, and induced it to bor-
row $8,000 from a bank and to place that amount in its
account in that bank, and then to draw its check on
that bank for $10,912.52, and the avails of the said dis-
counted notes and of said check amounting to $30,555
were used by Thomas W. Burrows to pay said claim
against the estate of Leonard B. Merrifield, deceased,
the consideration for which claim has been wholly re-
ceived by said Thomas W. Burrows. Thereupon said

Thomas W. Burrows and said Jarvis R. Burrows gave their note to the company for $30,045 and paid the small difference to the company. Said note matured December 16, 1907, and has never been paid. Thereafter the defendants alleged that the said last mentioned note given by them to the company was only executed for the purpose of making the books of the company balance, and that they were not liable thereon, and afterwards Jarvis R. Burrows abstracted said note from the files of the company and claimed to have destroyed the same. Said discounted notes, amounting to $20,000, became due and were not paid and had to be renewed, and Mary C. Merrifield was obliged to put up collateral security to obtain the renewals, which collateral security was worth $14,000 and she was afterwards compelled to purchase three of the four notes renewing said discounts. She began suits to collect some of these disbursements against the company and Louis W. Merrifield and Thomas W. Burrows; and the company commenced a suit against the Burrows brothers to collect said note for $30,045. Each of these suits is pending, and said Thomas W. Burrows and Jarvis R. Burrows are defending and denying their liability.

After the death of Leonard B. Merrifield, Louis W. Merrifield, who will hereinafter be called Merrifield, became the president and general manager, and Thomas W. Burrows, the vice-president, which officer under the by-laws was authorized to perform the duties of the president and general manager in the absence of the president. Thomas W. Burrows was also made treasurer and Jarvis R. Burrows secretary and traveling auditor.

Thomas W. Burrows became the physician of Merrifield, who was in poor health, and advised him to cease from labor, and, as a result of that advice, Thomas W. Burrows, the vice-president, took upon himself the duties of president and general manager, and so conducted the affairs of the company that in

the spring of 1907 it was found that the assets of the company had depreciated nearly $100,000 and the liabilities had increased to $50,000, a net depreciation as we understand the bill of about $145,000 during the time that Thomas W. Burrows had conducted the business. The board of directors during that time had consisted of three persons representing the Merrifield interests, and of Thomas W. Burrows and Jarvis Burrows. Shortly after the Burrows brothers became stockholders, on motion of Thomas W. Burrows, the company ordered a dividend of fifty per cent, and later in the same year, on motion of Thomas W. Burrows, a further dividend of twenty per cent, and the bill alleges that these dividends were paid to Thomas W. Burrows and Jarvis R. Burrows, respectively, and they thereby received $35,000. In the case reported in 144 Ill. App. 350, it was contended by the Burrows brothers in argument that those dividends were paid upon their indebtedness, and it may be that this is so, for by some means their indebtedness to Mary C. Merrifield was reduced from about $69,000 to about $30,000, the amount for which she now holds their shares of stock as collateral security. Afterwards Thomas W. and Jarvis R. Burrows having overdrawn their accounts for their salaries, a further dividend of ten per cent was ordered, that the company might thereby collect said overdrawn accounts from their part of the dividend. No other dividend has since been declared, and the depreciation in assets is no doubt partly accounted for by said dividends. In the spring of 1907 Merrifield resumed the duties of president. Thereafter the Burrows brothers committed various acts as set out in our former opinion, calculated to embarrass the business of the company. In May, 1907, they filed a bill and obtained a receiver for the company, and in November of that year dismissed that suit. The by-laws required the annual meeting of stockholders to be held on the twenty-eighth day of December each year. There was a deadlock at the annual meeting on December 28, 1907, and at the ad-

journed meeting held in January, 1908, the Burrows brothers voting their 500 shares one way and the Merrifields voting their 500 shares the other way. Two different sets of directors were alleged to have been elected and two sets of directors' meetings were thereafter held, and Thomas W. Burrows thereafter sought to act as president and to overturn the authority of Merrifield, who also claimed to have been elected as president, and who held over as president if no president had been elected at that meeting. The injunction suit reported in 144 Ill. App. 350 followed thereafter. We there held that the pretended stockholders' meeting and the subsequent directors' meeting held by the Burrows brothers were fraudulent, and that either the Merrifield meeting was valid and Merrifield was elected president and Wood vice-president and the Burrows brothers were allowed to hold over as treasurer and secretary, or else that there was no valid election of officers that year and Merrifield held over as president and general manager, Thomas W. Burrows as vice-president and treasurer and Jarvis R. Burrows as secretary. In that bill the company claimed that there had been a valid election, electing Merrifield president and general manager and Wood vice-president. But in the present bill it is conceded that none of the elections in January, 1908, to which time the meeting of December 28, 1907, had adjourned, were valid. It concedes that the old officers held over.

The bill in this case then sets out at great length the events which have occurred since the bill in that case was filed. It states that in February, 1908, Thomas W. Burrows took out of the vault of the said company a pocket book containing about three hundred of the bills receivable of the company and carried them away and afterwards was adjudged in contempt of court for so doing; that Jarvis R. Burrows had removed to Chicago and that John H. Williams, whom though not a stockholder, the Burrows brothers had attempted to elect a director at their fraudulent meeting aforesaid,

brought a suit against the company in the Municipal Court of Chicago and caused a summons to be served upon said Jarvis R. Burrows as secretary, and that he did not report that suit to the president of the company, and that it was only by accident that the pendency of that suit was learned, and that this conduct was intended to embarrass the company; that the bylaws required the secretary to countersign all notes and other documents requiring the signature of the company, and that he persistently refused to perform those duties and remained in Chicago where he could not perform them, and that the company was greatly harassed because its bank refused to cash the checks of the company unless countersigned by said secretary or by Thomas W. Burrows, who under the bylaws had no authority to countersign such checks, and that by reason of its difficulty in drawing on its bank account the credit of the company and its business was greatly hampered and embarrassed. Thereupon the president called a special meeting of the directors to take action upon this condition of things, and the defendants obtained an injunction restraining the officers and directors of the company from holding such a meeting.

On Monday, December 28, 1908, at 2 o'clock P. M., in the directors' room in the office building of the company, the annual meeting of the stockholders then convened. There were present Merrifield, the president, owning 180 shares; George R. Wood, owning 20 shares; Mary C. Merrifield, owning 150 shares, by her proxy and attorney in fact, Duncan McDougall; Lilla M. Wood, owning 150 shares, by her proxy George R. Wood, making 500 shares owned by the Merrifield interests; and Jarvis R. Burrows owning 250 shares and Thomas W. Burrows, owning 250 shares, by his proxy, L. W. Brewer, Jr. On the evening of the first day's session Jarvis R. Burrows had delivered at the office building of the company a cot and blankets, and he remained there day and night, and that meeting remained in continuous session night and day, and was still in

session on Saturday, January 2, when this bill was filed. The persons representing the Merrifield interests were also compelled to be there night and day. No business was transacted. In voting for directors 500 votes were cast on one side and 500 votes on the other. Upon every motion or proposition that was voted upon there was a tie, including every proposition to adjourn, either to a fixed future date or indefinitely, the 500 shares of the Burrows interests being voted always against any adjournment. Propositions were made by the Burrows brothers to elect two of the Merrifield party and the two Burrows brothers and to agree upon a fifth director out of three names submitted by the Burrows brothers, but these propositions were not accepted. The result was that the business of the company was demoralized. The president had to attend this meeting day and night, and did not have time to open his mail and to attend to the business presented thereby. It was evidently the intention of the Burrows brothers to keep that meeting in continuous session, night and day, without even a continuance for the purpose of sleep, until the owners of the Merrifield shares were exhausted, and then to secure the election of three directors selected by the Burrows brothers and the future control of the corporation. Originally the directors had to be chosen from the stockholders and as the Burrows brothers had not possession of their certificates of stock, they could not surrender them and cause a share to be issued to another party friendly to themselves, and if that by-law had remained in force they could not have elected more than two stockholders friendly to themselves. But in apparent anticipation of this contingency, Dr. Burrows, at a time when the relations between the parties were friendly, had proposed and secured the adoption of an amended by-law, which amendment it was afterwards ascertained omitted the requirement that the directors should be chosen from the stockholders. The situation then was this: The Burrows brothers were

not in possession of the certificates for a single share of stock. The 500 shares upon which they voted were in the possession of Mrs. Merrifield as collateral security for a debt for the principal sum of about $30,-000 for the purchase price for this same stock. In addition they owed the company over $30,000, the real consideration of which was another part of the purchase price agreed to be paid by the Burrows brothers for their stock, which, by the manipulations already described, they had induced the company to advance. Suits were pending against them for these debts, and if they could secure the control of the corporation they could prevent the company from further prosecuting its suit against them. So far as appears, they have paid out but very little of their own money for their shares of stock, and all their efforts have resulted in the embarrassment and injury of the corporation. If Leonard B. Merrifield had caused these shares to be left in his name till paid for, or had caused them to be placed in the hands of a trustee till the Burrows brothers had paid for them, the present contingency could not have arisen. But the stock having been put in the names of the Burrows brothers on the books of the company, the law gave them the right to vote upon these 500 shares the same as if they were paid for, notwithstanding that the certificates are held in pledge by the Merrifield interests. While this situation remains and the Burrows brothers persist in the course of conduct described in this bill, there cannot be any fair election of a board of directors. If Mrs. Merrifield obtains a judgment upon her note and takes due proceedings to have the shares sold in payment thereof, the Burrows brothers will cease to own and to be able to vote upon one-half of the shares. The bill clearly shows that they are insolvent except as to the value of these shares, which are much depreciated by the course that has been pursued. So far as appears from this record they have paid but a small sum of their own money upon these shares. If the meeting had continued in session and by the physical exhaustion

of the Merrifield family the Burrows brothers had been able to obtain control for a few minutes, they would have obtained control of the corporation and control of the several suits now pending, including some not mentioned here. If neither side became exhausted, the business of the company would be ruined because of the inability of the president to attend to it and because of the inability to elect any further officers. In our opinion a court of equity ought to have power to relieve that situation. On Saturday afternoon, January 2, 1909, this bill was filed, setting up these and many other facts and detailing at great length the injury being inflicted upon the property and business and credit of the company; and upon that bill the chancellor enjoined the further holding of this stockholders' meeting or of any stockholders' meeting till the further order of the court; and appointed a receiver, not of the company itself, but of its property and business, and selected as the receiver a person with whom both parties expressed themselves entirely satisfied. We are of opinion that this was a case of extreme necessity, and that it would be a reproach to our jurisprudence if a court of equity could not save the corporation from the destruction of its property and business and credit which was impending. We are of the opinion that the injunction was properly granted and that the facts alleged authorized the appointment of a receiver. It will be observed from the facts above stated that the Burrows brothers at one time had a receiver of this solvent corporation for several months, and that at another time they procured an injunction restraining its directors from electing a secretary and a treasurer; so that the principle of the orders here appealed from had the previous sanction of the Burrows brothers. Indeed, we are of opinion that these orders will be beneficial to their real interests.

The order does not mean, as seems to be supposed, that the stockholders are enjoined from holding a

stockholders' meeting "except with the consent and under the direction of the receiver," but the injunction against the stockholders from holding a meeting is absolute till the further order of the court. They are however enjoined from intermeddling with the management and control of the business of the corporation, except with the consent and under the direction of the receiver, which enables the receiver to avail himself of the services of any of the stockholders whenever he conceives that they will aid him in the discharge of his duties as receiver, and to this no exception is urged.

Criticisms are made upon the form of the prayer wherein the company alone prays for the injunction against all the stockholders, and all the complainants pray for the other relief. We do not see that the validity of the orders appealed from is affected by that circumstance. It is asked how long this receivership is to remain in force. We do not think it essential that that question be answered now. Upon the present appeal it must be taken to be absolutely true that the Burrows brothers are indebted to Mrs. Merrifield and to the company in the amounts stated, and it must be presumed that she and the company will recover judgments therefor, and, there being no other property available for the collection of those judgments, it must be assumed that Mrs. Merrifield will take steps to cause her judgment to be made out of the stock pledged to her, and that the company will levy upon those shares of stock to make its judgment, and that the Burrows brothers will either find other means to pay for their stock or will cease to be stockholders in this corporation. If they cease to be stockholders, there will be no difficulty in disposing of this suit. If they find means to pay these debts and become possessed of their certificates of stock and no change occurs in the feeling of the different parties towards each other, a serious question will arise as to what shall be done with the receivership, but meanwhile the prop-

erty and business will have been preserved for the just and equal benefit of all. We do not think it necessary to solve uncertain problems now. We think it was the duty of the court below to preserve this valuable property and business from the destruction which was impending because of the equal ownership of its stock between two warring factions. The holding of a stockholders' meeting is only enjoined until the further order of the court. No doubt an order permitting a stockholders' meeting will be granted whenever it is shown that for any reason a board of directors can be elected. The bill does not seek to prevent a majority of the shares from controlling the business of the company. The case made is that those owning exactly one-half of the shares, but with comparatively slight financial interest therein, are seeking to ruin the business of the corporation, and thereby to ruin those who own one-half of the shares and who have possession of the certificates for the other one-half of the shares with a large equitable and financial interest therein. The object of the bill is to preserve the property and business and credit of the company for the benefit of every shareholder alike. If a court of equity is powerless to grant this relief, then those who own far the largest financial interest in this corporation are without any remedy except an unconditional surrender to such terms as the Burrows brothers may impose.

The orders appealed from are therefore affirmed.

*Affirmed.*