120    APPELLATE COURTS OF ILLINOIS.

Western Cottage Piano & Organ Co. v. Burrows, 168 Ill. App. 120.

---

Western Cottage Piano & Organ Company, Defendant in Error, v. Thomas W. Burrows et al., Plaintiffs in Error.

## Gen. No. 5458.

1. CORPORATIONS—*when defense of ultra vires unavailing.* In an action by a corporation to recover money disbursed by it, stockholders who have received the benefit of the disbursement of such money cannot defend against their promise to repay the same upon the ground that such disbursement was *ultra vires* the corporation; especially is this true where such stockholders occupy positions of trust and confidence.

2. INSTRUCTIONS—*when errors will not reverse.* Errors in instructions will not effect a reversal if no substantial defense was interposed.

3. PLEADING—*when estoppel available.* While estoppel may be pleaded specially yet it may also be proved without pleading it.

Assumpsit. Error to the Circuit Court of La Salle county; the Hon. RICHARD M. SKINNER, Judge, presiding. Heard in this court at the April term, 1911. Affirmed. Opinion filed March 13, 1912. *Certiorari* denied by Supreme Court (making opinion final).

EDDY, HALEY & WETTEN and BUTTERS & ARMSTRONG, for plaintiffs in error.

C. B. CHAPMAN and DUNCAN, DOYLE & O'CONOR, for defendant in error.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

On December 16, 1904, plaintiffs in error executed and delivered to defendant in error a promissory note payable to the order of defendant in error three years after date, for the principal sum of $30,045 with interest at 5% per annum. No part of said note was paid. On December 26, 1907, defendant in error brought this suit against the makers of said note and filed a declaration containing a special count upon the note and the common counts. The principal defenses are that the transaction out of which the note arose was *ultra vires,* and that the signing of the note by plaintiffs in error was without consideration, and that the only purpose of the note was to properly adjust the books of the company for the time being, with no intention on the part of any one that the note should ever be enforced. There was a jury trial and a verdict in favor of defendant in error for $39,146.07. Motions by plaintiffs in error for a new trial and in arrest of judgment were denied. Defendant in error had judgment on the verdict, and the defendants below prosecute this writ of error to review said judgment.

The note here sued upon was given in final liquidation of a debt which was originally evidenced by a note dated December 24, 1902, due on or before five years after date, in the principal sum of $30,000 with interest at 5% per annum, payable to the order of A. H. Merrifield, signed by plaintiff in error, Thomas W. Burrows, and endorsed upon the back by L. B. Merrifield. We conceive it to be a material question who was the primary debtor in that transaction, and there is a direct conflict in the evidence on that subject. The matters here litigated are set forth and discussed to a considerable extent in Western Cottage Piano & Organ Company v. Burrows, 144 Ill. App. 350, and Merrifield

122    APPELLATE COURTS OF ILLINOIS.

Western Cottage Piano & Organ Co. v. Burrows, 168 Ill. App. 120.

v. Burrows, 153 Ill. App. 523. L. B. Merrifield died April 15, 1903. He was the president of defendant in error, and for many years he and his immediate family had been the owners of a majority of the stock in defendant in error, and in a prior like corporation whose legal existence had expired by limitation of time. He was seriously ill for a long time before his death. He had a wife, Mary C. Merrifield, a son, Louis W. Merrifield, and a daughter, Lilla M. Wood, the wife of George R. Wood, a clergyman. Thomas W. Burrows was a physician in active practice and was in attendance upon L. B. Merrifield during the long illness which resulted in his death, and had also acted as physician for all the other members of the family. Jarvis R. Burrows was a lawyer; had been receiver of a street railway corporation in which L. B. Merrifield owned a large interest; and had been attorney for L. B. Merrifield and for L. W. Merrifield and for defendant in error in various matters. L. B. Merrifield during his long illness had great confidence in the Burrows brothers and their relations were very intimate, and L. B. Merrifield came to believe that it would be highly advantageous to himself and to his family to have the Burrows brothers associated with him in the ownership of the capital stock of defendant in error, of which, as before stated, L. B. Merrifield and his wife and his son and daughter and son-in-law owned a decisive majority, the rest of the stock being owned by A. H. Merrifield and O. C. Merrifield, brothers of L. B. Merrifield, and by several other persons. It was proposed that a holding company be organized under the laws of New Jersey and that all the stock which could be obtained be placed in the hands of that company and voted by it, and such a company was organized in New Jersey, but the plan was found to be impracticable and was abandoned. It was decided that all the capital stock held by others than the L. B. Merrifield family should be bought in; that the stock of the L. B. Merrifield family should be valued at $400

per share; that the outstanding stock when purchased should be valued at what it cost to buy it; that the stock should be equally divided between L. B. Merrifield and the members of his immediate family on the one hand, and the Burrows brothers on the other (the total number of shares of the capital stock of defendant in error being 1,000); and that the Burrows brothers should pay to L. B. Merrifield a sum sufficient so that the stock which they obtained, so purchased in, should cost them as much as the Merrifield stock was valued at under this arrangement.

A. H. Merrifield owned 140 shares, and he sold them for $33,600. He was paid $3,600 in cash and received for the balance the note for $30,000 already mentioned, which transaction was consummated on December 24, 1902. It is the claim of plaintiffs in error that L. B. Merrifield conducted the negotiations and bought this stock from A. H. Merrifield and that it was his stock and his debt, but that L. B. Merrifield feared that if A. H. Merrifield knew that L. B. Merrifield was the buyer he would not sell at that price, and therefore Dr. Burrows was represented to A. H. Merrifield by both L. B. Merrifield and Dr. Burrows as the purchaser of this stock, and the papers were made so to read. There is testimony in the record to that effect, but there is a very great preponderance, both of oral and documentary evidence, that this was a purchase from A. H. Merrifield by Dr. Burrows. Dr. Burrows drew three papers that were executed that day. He signed the note for $30,000 thereby making himself on the face of the papers the principal debtor. No adequate reason is shown why he would consent to give his note for another man's debt. He testified that L. B. Merrifield wrote his name across the back of the note and then told Dr. Burrows to sign it as maker. There is oral testimony that Dr. Burrows told a witness that when he bought this stock, A. H. Merrifield refused to accept his unsecured note for $30,000 and that therefore

he found it necessary to procure the endorsement of L. B. Merrifield upon the note. Dr. Burrows gave his personal check to A. H. Merrifield for $3,600 the cash payment. Dr. Burrows drew and took from A. H. Merrifield on that day a receipt wherein A. H. Merrifield acknowledged that he had received from Thomas W. Burrows $33,600 in full for 140 shares of the stock of defendant in error. He also took from A. H. Merrifield a bill of sale to Dr. Burrows of 140 shares of the stock of defendant in error. A. H. Merrifield assigned the certificate in blank. There is evidence that this was temporarily left with L. B. Merrifield to secure him for his liability as endorser on the note. What afterwards was done with it will appear hereafter. That stock has ever since been owned by one of the Burrows brothers and is a part of the 500 shares which they now possess. Dr. Burrows testified that in 1903, when he was alone with L. B. Merrifield in the home of the latter a little over a month before L. B. Merrifield died, they had a settlement in which L. B. Merrifield agreed to pay this $30,000 note. If that were true, it would be a serious abuse of the confidential relations existing between Dr. Burrows, the trusted physician and friend, and this very sick man, to have a transaction involving perhaps $200,000 closed without the presence of any member of the family of L. B. Merrifield, and it would be very strange that L. B. Merrifield should consent to transact alone so important a matter with any one when he had other members of his family near at hand, and when his son, L. W. Merrifield, lived about a block away. The evidence, however, is clear and convincing that the son, L. W. Merrifield, and the son-in-law George R. Wood were both present at that interview, and that Mrs. Wood was in the house and knew of it, and that no such arrangement or promise was made by L. B. Merrifield; but, on the contrary, that there was then present a certain exhibit 29 in the handwriting of Dr. Burrows, which plainly shows that in the arrangements of that

day this $30,000 note was recognized as a liability of
Dr. Burrows. Again, at about the end of one year
from the date of the $30,000 note, Dr. Burrows caused
a servant of defendant in error to make out a check
of defendant in error to A. H. Merrifield for $1,500
for one year's interest on said note, and directed the
bookkeeper to charge the same, one-half to Dr. Bur-
rows and one-half to Jarvis R. Burrows, on the books
of the company, and that check was delivered to A. H.
Merrifield in payment for one year's interest, and was
so charged on the books of defendant in error. It is
not reasonable to believe that Dr. Burrows would have
paid this interest if this were really the debt of L. B.
Merrifield. After L. B. Merrifield died, Dr. Burrows
became the administrator of his estate. A. H. Merri-
field filed a claim against the estate of L. B. Merrifield
based upon the endorsement of L. B. Merrifield on the
back of this $30,000 note, and Dr. Burrows caused or
permitted it to be allowed. Thereafter A. H. Merri-
field died, and his widow, Lucy D. Merrifield, became
administrator of his estate. Before L. B. Merrifield
died, he had divided most of his property among his
wife and children. Mrs. Lucy D. Merrifield feared
that she could not collect this note from Dr. Burrows
and feared that there was not enough property left in
the estate of L. B. Merrifield to pay it, and she accord-
ingly filed a bill in equity against the L. B. Merrifield
family charging that the gifts by L. B. Merrifield to
his family would prevent the collection of this claim,
and were fraudulent as to her. Thereupon Dr. Bur-
rows wrote and inserted in a local newspaper over his
signature a long statement, in which he declared that
he purchased this stock from A. H. Merrifield, and paid
therefor part cash, and for the rest gave his note pay-
able five years after date secured by the endorsement
of L. B. Merrifield, in order to obtain which he put up
collateral security with L. B. Merrifield, and that he
was amply able to pay the note when it became due

without any recourse whatever upon his endorser, and that this note was an unjust attempt to collect the debt before it was due. The note here sued upon signed by Dr. Burrows and Jarvis R. Burrows, was given to procure satisfaction of that claim in the manner hereinafter stated. The fact that Dr. Burrows signed the present note is strong evidence that the original note was his indebtedness. In addition to all this, the oral testimony of John Gamber, deputy probate clerk, Duncan McDougall, the attorney of Lucy D. Merrifield, and the evidence of Lucy D. Merrifield, George R. Wood and Louis W. Merrifield, all shows that on many different occasions Dr. Burrows said that this $30,000 note to A. H. Merrifield was his personal debt, and that he would pay it, many of these statements being made long after the death of L. B. Merrifield. There are other facts and circumstances in evidence tending to prove that this was the personal debt of Dr. Burrows. Dr. Burrows denied some of these statements, and testified that he did not recollect others. When all this evidence is considered, it must be regarded as conclusively established that Dr. Burrows bought this stock from A. H. Merrifield, and that the $30,000 note was his own debt whereby he agreed to pay a part of the consideration for that stock.

There are many facts in evidence that show that Jarvis R. Burrows was jointly interested with Dr. Burrows in the buying of the A. H. Merrifield stock and of all the other stock which they procured and which made up the 500 shares which the Burrows brothers now own. The A. H. Merrifield certificate was surrendered and was used as a part of the stock included in a certificate for a large number of shares which was issued to Jarvis R. Burrows and which he still owns. As already stated, one-half of the first year's interest on the A. H. Merrifield note, paid by direction of Dr. Burrows with a check of defendant in error, was charged to Jarvis R. Burrows in his account with the defendant in error. It does not appear that Jarvis

SECOND DISTRICT—MARCH, 1912.     127

Western Cottage Piano & Organ Co. v. Burrows, 168 Ill. App. 120.

R. Burrows was present when this check was drawn and this charge was made, but he was an officer of the corporation, he was often at its office and had access to its books, and he testified that he probably saw this charge upon the books. After 500 shares of the stock had been procured by and for the Burrows brothers, they divided it equally between them, so that Dr. Burrows owned 250 shares and Jarvis R. Burrows 250 shares, and all the Merrifield stock for which this $30,000 note was given went into the shares of stock issued to Jarvis R. Burrows, and all this stock is now held as collateral to other indebtedness of Dr. Burrows and Jarvis R. Burrows, not involved in this suit. The fact that Jarvis R. Burrows signed the note here in suit is evidence tending to show that he was interested in that transaction as part owner of the stock paid for thereby.

At the time the note here sued upon was executed and during the negotiations prior thereto, the confidential relations between the Burrows brothers and the members of the Merrifield family still continued. Dr. Burrows was the vice-president and treasurer of the company, Jarvis R. Burrows was its attorney, and also held an office and was a director. The other directors were Louis W. Merrifield, George R. Wood, and Mary C. Merrifield. The Merrifields. urged Dr. Burrows to pay the claim allowed against L. B. Merrifield's estate in favor of A. H. Merrifield. He declared that he was unable to do so then, but would be able to do so when that note by its terms became due, which would have been December 24, 1907. Dr. Burrows and Jarvis R. Burrows proposed that the corporation pay the claim and that the Burrows brothers would give their note therefor to the corporation payable at about the time when the A. H. Merrifield note would mature by its terms. Wood at this time was living at Wheaton. He was sent for and came to Ottawa, and a conference was held at which the Burrows

128    APPELLATE COURTS OF ILLINOIS.

Western Cottage Piano & Organ Co. v. Burrows, 168 Ill. App. 120.

brothers, L. W. Merrifield and George R. Wood were present and in which the proposition was again stated by the Burrows brothers and discussed that the company should raise this money and pay the claim and that the Burrows brothers should give their note, payable at about the maturity of the A. H. Merrifield note by its terms, for the amount required to liquidate the claim. A directors' meeting was then held and Jarvis R. Burrows presented a resolution which he had prepared, authorizing the officers of the company to borrow $30,000 for corporate purposes. Wood raised the question why the purposes should not be stated correctly in the resolution and was told by Dr. Burrows and Jarvis R. Burrows that it might be that it would not be necessary to use the money for this purpose, and that there were other proper corporate purposes for which they could use it if it became unnecessary to pay this claim, and also that this arrangement would be legal and proper if the stockholders agreed to it and the board of directors authorized it. The assurances given by Dr. Burrows and Jarvis R. Burrows procured the adoption of the resolution without dissent. Some time thereafter four notes of the corporation for $5,000 each were prepared and executed by the corporation by its president, and endorsed by Dr. Burrows and Louis W. Merrifield, and said notes were further secured by a certificate of deposit which Mary C. Merrifield had in the sum of $14,000. These papers were delivered to Rickards & Company, a Chicago firm, and on October 18, 1904, they discounted the said four notes for $19,642 and a draft for that amount was given to Dr. Burrows and Louis W. Merrifield which one of them brought to Ottawa. Louis W. Merrifield then took said draft and deposited it in a bank in his own name, for the reason that his mother's collateral had been put up as security and his father's estate was held for the claim, and not enough money had yet been secured to pay it and he therefore thought he ought

SECOND DISTRICT—MARCH, 1912.    129

Western Cottage Piano & Organ Co. v. Burrows, 168 Ill. App. 120.

to keep it under his own control till they were ready to pay the claim.  He took from the bank for this sum an interest bearing certificate, and the interest received thereon was afterwards turned over to defendant in error.  Thereafter, on December 16, 1904, the corporation, acting through its officer, Dr. Burrows, borrowed from a local bank $8,000 giving its note therefor; and thereupon the certificate of deposit for $19,642, and the money obtained from the local bank, and something over $2,000 of the funds of defendant in error on deposit in the bank, were placed in the hands of Dr. Burrows, the vice-president and treasurer, and by him paid to Lucy D. Merrifield, administratrix of the estate of A. H.. Merrifield, deceased, in full satisfaction of the claim, the amount so paid being $30,545 and somewhat less than the amount due to the estate of A. H. Merrifield, the deduction being a concession to procure the settlement.  Thereupon, on December 16, 1904, the note in suit here was prepared and signed by Dr. Burrows and by Jarvis R. Burrows and delivered to the corporation.  Thereupon Dr. Burrows directed the bookkeeper to charge the estate of L. B. Merrifield with these payments, and to credit it with a note for $30,545 balancing the account so opened.  There was in fact no note of that amount.  Why the note then taken from the Burrows brothers was $500 less than the amount so paid out that day in satisfaction of the A. H. Merrifield claim does not seem to be clearly explained.  Apparently the Burrows brothers claim that they then paid the corporation this difference of $500 and the Merrifields deny it.

It is contended that this transaction was *ultra vires,* that the corporation had no lawful authority to pay this claim, or to lend its credit or money to pay the same, and that therefore the note which it then received from the Burrows brothers is void, and cannot be enforced by the corporation.  It will be observed that this is not a case where an effort is being

made to force the corporation to perform a contract it
has made, and the corporation is insisting that it has
incurred no liability, because the contract was one
which it had no power to perform. If, after the board
of directors had agreed that this money should be
raised, and should be turned over in satisfaction of the
claim, defendant in error had then refused to do so,
and this were a suit to compel it to pay the A. H.
Merrifield claim, as it had agreed to do, no doubt it
would be a complete defense to the corporation that it
had no power to make such a contract. But here the
corporation has performed all that it agreed to do.
It has paid the debt of Thomas W. Burrows to A. H.
Merrifield, it has paid for the 140 shares of stock
which were sold to Thomas W. Burrows by A. H. Mer-
rifield, and which were transferred into a certificate of
stock to Jarvis R. Burrows, and which he now owns.
To permit the doctrine of *ultra vires* to now excuse
Dr. Burrows and Jarvis R. Burrows from paying this
money back as they agreed to do, is to allow the prin-
ciple of *ultra vires* to be used, not in favor of justice,
but to defeat justice. We are of the opinion that after
the Burrows brothers have had the benefit of this
transaction, and have become the owners of the stock
for which this money was paid, they should be estopped
from denying their liability to pay back the money of
which they have had the benefit. This is especially
true in view of the fact that this action by the corpora-
tion was procured upon the representations of Dr.
Burrows, the trusted physician and familiar friend of
the Merrifield members of the board of directors, and
of the Merrifield stockholders, and the trusted friend
of their deceased father, and of Jarvis R. Burrows,
who had been attorney for their father, and was the
attorney of L. W. Merrifield, and was the attorney of
the corporation; and that these men lulled into security
the Merrifield branch of the board of directors by as-
suring them of the propriety and legality of this ac-

tion.   The corporation is not declaring this action
*ultra vires*.   The majority of the board of directors
are seeking to enforce payment.   If the rights of cred-
itors of the corporation are concerned at all, it is to
have this money paid back into the treasury of the cor-
poration.   No stockholders are claiming that this was
*ultra vires* except the two stockholders who received
the benefit; one, the man who, as treasurer, paid out
over $30,000 of the money of the corporation in satis-
faction of his private debt; the other, the stockholder
whose stock was paid for by the money so taken from
the treasury.   They are asserting the illegality of their
own acts to escape paying back the money which they
then obtained.   Dr. Burrows certainly owes the cor-
poration this money.   As the stock which Jarvis R.
Burrows owns was obtained and paid for with this
money, no one can object to his also admitting a lia-
bility on his part to pay therefor.   If Dr. Burrows
could have paid this money back on the day this note
was given, it was his duty to do so.   If Jarvis R. Bur-
rows could assist, no one else could object to his doing
so when he was the actual beneficiary of the payment.
It was the duty of this corporation to get this money
back, no matter how wrongful the paying out of it
may have been.   The corporation, on the theory of
plaintiffs in error, could have immediately sued Dr.
Burrows for the money and could have recovered.
The Burrows brothers declared that they could not pay
the money then, but that they could pay it at the time
when the A. H. Merrifield note would have matured
by its terms, which was three years later.   Why should
Dr. Burrows not be permitted to agree to pay it back
at that time, and to agree to give his brother as se-
curity?   The corporate form ought not to be permitted
to be used to carry out a fraud, or work injustice.   The
real fact is that Mary C. Merrifield, Louis W. Merri-
field, Lilla M. Wood and George R. Wood own one-
half of this corporation, and Dr. Burrows and Jarvis

R. Burrows own the other half, and the latter have persuaded the former to let them use the funds of the corporation to pay for a part of the stock owned by the Burrows brothers. They agreed to pay for it in three years; they put that agreement in writing and each of them signed it. It is just, equitable and right that they should pay it. Nothing stands in the way of their paying it except a technical rule of law. The plaintiffs in error seek to invoke the alleged illegality of that which they themselves urged and procured the others to consent to, as their only defense against paying this money back. We are of opinion that the form ought to yield to the justice of the action.

Plaintiffs in error contend that the court erred in admitting the testimony which shows who bought the property for which the A. H. Merrifield note was given, and whose primary debt that note was; first, because this proof contradicts the judgment of the Probate Court, allowing said note as a claim against the estate of L. B. Merrifield, deceased; and second, because this proof is immaterial. The judgment of the Probate Court determined that L. B. Merrifield wrote his name on the back of the note, and thereby became liable to A. H. Merrifield therefor; but it did not decide whether L. B. Merrifield was liable thereon as principal or as surety for Dr. Burrows. That judgment had no tendency even to prove that L. B. Merrifield was the principal debtor or that the note was given to pay for capital stock bought by him. We are of opinion that in determining whether or not the makers of the note sued on are estopped to set up the defense of *ultra vires,* it is important to know whether, in inducing the other members of the board of directors to pay the A. H. Merrifield claim they were inducing those other directors to whom they occupied these confidential relations to pay for property purchased by Dr. Burrows, and thereby acquired for Jarvis R. Burrows, or whether they were thereby inducing the cor-

poration to pay the debt of the ancestor of the owners of the other half of the capital stock. In determining the motives actuating Dr. Burrows and Jarvis R. Burrows in persuading the corporate officers to consent to this use of the corporate money, it is important to know whether they were serving their own interests, or were merely acting from a spirit of friendship to the owners of the other half of the capital stock.

Complaint is made of the giving of instructions for defendant in error and of the refusal of instructions requested by plaintiffs in error. While the instructions given for defendant in error may not be in every particular absolutely correct, yet in the main they accord with the views herein expressed, and we think it sufficient to say of the refused instructions that part of them were incorrect and the rest were sufficiently embodied in the instructions which were given at the request of plaintiffs in error. If there are any errors in the rulings upon the instructions, yet we are of opinion that plaintiffs in error are estopped to set up the defense of *ultra vires,* and that with that defense eliminated no substantial defense to this note appears, and that the judgment ought to stand, and that a verdict against the defendant in error could not be sustained upon this record.

Omitting the declaration and a large number of demurrers and similiters contained in the record, the number of pleas, replications, rejoinders and surrejoinders, amount in number to seventy, which we regard as a great abuse of special pleading. It would require a volume to set out all these special pleadings and discuss them at length and we do not deem it our duty to burden the reports therewith. While estoppel may be pleaded specially, yet it may also be proved without pleading it. German Fire Ins. Co. v. Grunert, 112 Ill. 68; Evans v. Howell, 211 Ill. 85, 93. Therefore in answering every pleading of any kind filed by plaintiffs in error wherein they set up a claim that this

transaction was *ultra vires* and because thereof no recovery can be had, defendant in error had the right to prove the reply to such pleading that plaintiffs in error were estopped, and having proven that estoppel, in our judgment defendant in error disposed of the only substantial defense interposed.

We find no reversible error in the record, and the judgment is therefore affirmed.

*Affirmed.*